**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | | |
|---|---|---|
| **VIRNETX INC. AND** | § | |
| **LEIDOS, INC.,** | § | |
| | § | **Civil Action No. 6:12-cv-855-RWS** |
| | § | |
| **Plaintiffs**, | § | |
| | § | |
| **v.** | § | **FILED UNDER SEAL** |
| | § | |
| **APPLE INC.** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **Defendant**. | § | |

**APPLE'S OMNIBUS MOTION FOR JUDGMENT
AS A MATTER OF LAW UNDER RULE 50(b) AND FOR A NEW TRIAL**

## TABLE OF CONTENTS

**Page**

**I.   VirnetX Failed to Present Sufficient Evidence to Support a Finding of Infringement** ........................................................................................................ 1

    A.   Apple Is Entitled to JMOL of No Infringement on Redesigned FaceTime ............ 1

        1.   No Basis Exists from Which a Jury Could Reasonably Find That Redesigned FaceTime Includes the Claimed "Indication" ........................ 1

        2.   No Basis Exists from Which a Jury Could Reasonably Find That FaceTime Supports Establishing a "Secure Communication Link" ........... 5

        3.   No Basis Exists from Which a Jury Could Reasonably Find that FaceTime Contains a "Domain Name Service System" ............................ 5

    B.   Apple Is Entitled to JMOL of No Infringement by VPN On Demand .................. 6

        1.   No Basis Exists from Which a Jury Could Reasonably Find That VPN On Demand in iOS 7–8 Infringes the Asserted Claims .................... 6

        2.   VirnetX's Assertions That Redesigned VOD Is Capable of Infringement Do Not Establish Infringement .......................................... 11

    C.   Apple Is Entitled to JMOL of No Infringement on iMessage ............................. 14

    D.   Apple Is Entitled to JMOL of No Indirect Infringement ...................................... 15

**II.  VirnetX Failed to Present Sufficient Evidence to Support the Damages Award** ...................................................................................................................... 17

    A.   Mr. Weinstein's $1.20 Per-Unit Rate Cannot Support the Verdict Because It Is Unapportioned and Based on Non-Comparable Licenses ............................ 19

    B.   Mr. Weinstein's Recitation of the Word "Apportionment" Cannot Salvage the Verdict ........................................................................................................... 22

    C.   Mr. Weinstein's Testimony Confirms the Jury's Verdict Awards Damages Far Beyond the Claimed Inventions' "Footprint" in the Marketplace ................. 23

    D.   Mr. Weinstein's Model Violates the Entire Market Value Rule ......................... 25

    E.   VirnetX Cannot Be Awarded Double Recovery .................................................. 25

    F.   No Reasonable Jury Could Find Damages in Excess of $25.1 Million ............... 26

III.  **VirnetX Failed to Present Sufficient Evidence to Support a Finding of Willfulness** ........................................................................................ **27**

    A.  Apple's Reasonable and Good Faith Redesigns Preclude Willfulness ................ 28

    B.  No Evidence of Copying Exists, Weighing against Willfulness ......................... 30

    C.  Apple's Reasonable Reliance on Counsel's Advice Precludes Willfulness ........ 30

    D.  Apple's Successful -417 Action Appeal Precludes Willfulness .......................... 33

    E.  Apple's Reasonable Defenses Preclude Willfulness ............................................ 33

    F.  Apple's Belief That the Asserted Claims Were Invalid Precludes Willfulness ...................................................................................................... 34

IV.  **Apple Is Entitled to a New Trial on All Issues** .......................................... **35**

    A.  The Court Erred in Giving VirnetX's Proposed "Domain Name Service System" Instruction .............................................................................. 35

    B.  The Jury's Infringement Verdict Is against the Weight of the Evidence ............. 35

        1.  The Accused Features Do Not Infringe ................................................... 36

        2.  Apple Does Not Indirectly Infringe ........................................................ 38

V.  **Apple Is Entitled to a New Trial on Damages** .............................................. **38**

    A.  Mr. Weinstein's Testimony Should Have Been Excluded .................................. 39

    B.  The Exclusion of the PTO Proceedings Warrants a New Trial on Damages ....... 39

    C.  The Jury Instructions on Damages Were Erroneous .......................................... 40

        1.  The Jury Should Have Been Instructed on the EMVR ............................ 40

        2.  The Hypothetical Negotiation Instruction Was Incorrect ........................ 41

    D.  The Damages Award Is Excessive and against the Weight of the Evidence ........ 42

VI.  **Apple Is Entitled to a New Trial on Willfulness** .......................................... **45**

VII.  **Conclusion** ................................................................................................ **45**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACCO Brands, Inc. v. ABA Locks Mfr. Co.*,
  501 F.3d 1307 (Fed. Cir. 2007)..................................................................15, 38

*Aero Prods. Int'l, Inc. v. Intex Recreation Corp.*,
  466 F.3d 1000 (Fed. Cir. 2006)..................................................................25, 26

*Am. Home Assur. Co. v. United Space Alliance, LLC*,
  378 F.3d 482 (5th Cir. 2004) .............................................................................27

*Anascape, Ltd. v. Microsoft Corp.*,
  No. 9:06-CV-158, 2008 WL 7182476 (E.D. Tex. Apr. 25, 2008).........................30

*Aqua Shield v. Inter Pool Cover Team*,
  774 F.3d 766 (Fed. Cir. 2014)...........................................................................42

*Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*,
  402 U.S. 313 (1971)...........................................................................................40

*Bowers v. Baystate Techs., Inc.*,
  320 F.3d 1317 (Fed. Cir. 2003)..........................................................................26

*Branch-Hines v. Hebert*,
  939 F.2d 1311 (5th Cir. 1991) ...........................................................................14

*Braun Inc. v. Dynamics Corp. of Am.*,
  975 F.2d 815 (Fed. Cir. 1992)............................................................................30

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993).....................................................................................19, 23

*Cohesive Techs., Inc. v. Waters Corp.*,
  543 F.3d 1351 (Fed. Cir. 2008)..........................................................................34

*Commil USA, LLC v. Cisco Sys., Inc.*,
  135 S. Ct. 1920 (2015)........................................................................................16

*Commonwealth Sci. & Indus. Research Org. v. Cisco Sys., Inc.*,
  809 F.3d 1295 (Fed. Cir. 2015).....................................................................19, 22

*Davidson Oil Country Supply Co. v. Klockner, Inc.*,
  917 F.2d 185 (5th Cir. 1990) .............................................................................45

*Dorman Prods., Inc. v. Paccar, Inc.*, 201 F. Supp. 3d 663 (E.D. Pa. 2016),
    *as amended* (Oct. 17, 2016) ...............................................................................28

*Dynacore Holdings Corp. v. U.S. Philips Corp.*,
    363 F.3d 1263 (Fed. Cir. 2004).............................................................................24

*Ericsson, Inc. v. D-Link Sys., Inc.*,
    773 F.3d 1201 (Fed. Cir. 2014).....................................................................17, 26

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
    575 F.3d 1312 (Fed. Cir. 2009).............................................................................37

*Finisar Corp. v. DirecTV Grp., Inc.*,
    523 F.3d 1323 (Fed. Cir. 2008).............................................................................31

*Fujitsu Ltd. v. Belkin Int'l, Inc.*,
    No. 10-CV-03972-LHK, 2012 WL 4497966 (N.D. Cal. Sept. 28, 2012)...............34

*Fujitsu Ltd. v. Netgear Inc.*,
    620 F.3d 1321 (Fed. Cir. 2010).....................................................................11, 13

*Ga.-Pac. Corp. v. U.S. Plywood Corp.*,
    318 F. Supp. 1116 (S.D. N.Y. 1970).....................................................................39

*Garretson v. Clark*,
    111 U.S. 120 (1884)..............................................................................................17

*Gasoline Prods. Co. v. Champlin Ref. Co.*,
    283 U.S. 494 (1931)........................................................................................36, 38

*Giles v. Gen. Elec. Co.*,
    245 F.3d 474 (5th Cir. 2001) ................................................................................38

*Gilster v. Primebank*,
    747 F.3d 1007 (8th Cir. 2014) ..............................................................................43

*Global-Tech Appliances, Inc. v. SEB S.A.*,
    563 U.S. 754 (2011)..............................................................................................15

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
    136 S. Ct. 1923 (2016)....................................................................................29, 31

*Hewlett-Packard Co. v. Acceleron LLC*,
    587 F.3d 1358 (Fed. Cir. 2009).............................................................................15

*Jurgens v. CBK, Ltd.*,
    80 F.3d 1566 (Fed. Cir. 1996)...............................................................................29

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
 694 F.3d 51 (Fed. Cir. 2012)..........................................................................*passim*

*Lucent Techs., Inc. v. Gateway, Inc.*,
 580 F.3d 1301 (Fed. Cir. 2009)...........................................................................23, 24

*Lyle v. Bentley*,
 406 F.2d 325 (5th Cir. 1969) .......................................................................................36

*Medtronic, Inc. v. Mirowski Family Ventures, LLC*,
 134 S. Ct. 843 (2014) ...................................................................................................14

*Mirror Worlds, LLC v. Apple, Inc.*,
 784 F. Supp. 2d 703 (E.D. Tex. 2011), *aff'd*, 692 F.3d 1351 (Fed. Cir. 2012) ...........1

*Oracle Am., Inc. v. Google Inc.*,
 No. C 10-03561 WHA, 2012 WL 1189898 (N.D. Cal. Jan. 4, 2012)............................45

*Ortho Pharm. Corp. v. Smith*,
 959 F.2d 936 (Fed. Cir. 1992).....................................................................................33

*Perricone v. Kansas City S. Ry. Co.*,
 630 F.2d 317 (5th Cir. 1980) ................................................................................39, 43

*PharmaStem Therapeutics, Inc. v. Viacell, Inc.*,
 491 F.3d 1342 (Fed. Cir. 2007).....................................................................................38

*Powell v. Home Depot U.S.A., Inc.*,
 663 F.3d 1221 (Fed. Cir. 2011).....................................................................................42

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
 No. C 09-5235 MMC, 2014 WL 6859521 (N.D. Cal. Nov. 25, 2014)............................39

*Prism Techs LLC v. Sprint Spectrum L.P.*,
 849 F.3d 1360 (Fed. Cir. 2017).....................................................................................20

*Radware, Ltd. v. F5 Networks, Inc.*,
 No. 5:13-CV-02024-RMW, 2016 WL 4427490 (N.D. Cal. Aug. 22, 2016)...................28

*Read Corp. v. Portec, Inc.*,
 970 F.2d 816 (Fed. Cir. 1992).....................................................................................30

*ResQNet.com, Inc. v. Lansa, Inc.*,
 594 F.3d 860 (Fed. Cir. 2010).................................................................................23, 25

*Safoco, Inc. v. Cameron Int'l Corp.*,
 No. H-05-0739, 2009 WL 2424108 (S.D. Tex. July 31, 2009) ...............................34

*Skidmore v. Precision Printing & Packaging, Inc.*,
    188 F.3d 606 (5th Cir. 1999) ...................................................................14, 16

*Slimfold Mfg. Co. v. Kinkead Indus., Inc.*,
    932 F.2d 1453 (Fed. Cir. 1991)..........................................................................29

*Smartflash LLC v. Apple Inc.*,
    No. 6:13-cv-447-JRG, 2015 WL 5840237 (E.D. Tex. 2015) .................................39

*Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*,
    750 F.2d 1552 (Fed. Cir. 1984)..........................................................................42

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011)..........................................................................41

*Unisplay, S.A. v. Am. Elec. Sign Co.*,
    69 F.3d 512 (Fed. Cir. 1995)..............................................................................44

*United States v. John*,
    309 F.3d 298 (5th Cir. 2002) .............................................................................40

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
    503 F.3d 1295 (Fed. Cir. 2007)..........................................................................38

*VirnetX, Inc. v. Cisco Sys. Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014)............................................................... *passim*

*W. Elec. Co. v. Stewart-Warner Corp.*,
    631 F.2d 333 (4th Cir. 1980) .............................................................................32

*WesternGeco LLC v. ION Geophysical Corp.*,
    837 F.3d 1358 (Fed. Cir. 2016),
    *cert. granted on other grounds*, 138 S. Ct. 734 (2018)........................................28

*Westvaco Corp. v. Int'l Paper Co.*,
    991 F.2d 735 (Fed. Cir. 1993).......................................................................29, 32

*Yarbrough v. Sturm, Ruger & Co.*,
    964 F.2d 376 (5th Cir. 1992) .............................................................................36

*Zenith Labs., Inc. v. Bristol-Meyers Squibb Co.*,
    19 F.3d 1418 (Fed. Cir. 1994)............................................................................37

*Zygo Corp. v. Wyko Corp.*,
    79 F.3d 1563 (Fed. Cir. 1996)............................................................................13

## Rules

Fed. R. Civ. P. 50(a) ...............................................................................................27

Fed. R. Civ. P. 50(b) ............................................................................................................1, 27

Fed. R. Civ. P. 59 .................................................................................................................1

Apple respectfully moves for judgment as a matter of law ("JMOL") under Federal Rule of Civil Procedure 50(b) because the jury's verdict is not supported by substantial evidence. *See Mirror Worlds, LLC v. Apple, Inc.*, 784 F. Supp. 2d 703, 710 (E.D. Tex. 2011) (JMOL must be granted where "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [non-moving] party on that issue.") (citation omitted), *aff'd*, 692 F.3d 1351 (Fed. Cir. 2012). Alternatively, Apple submits it is entitled to a new trial under Federal Rule of Civil Procedure 59.

## I.     VirnetX Failed to Present Sufficient Evidence to Support a Finding of Infringement

### A.     Apple Is Entitled to JMOL of No Infringement on Redesigned FaceTime

#### 1.     No Basis Exists from Which a Jury Could Reasonably Find That Redesigned FaceTime Includes the Claimed "Indication"

Each asserted claim of the '504 and '211 patents requires a "domain name service system" that is configured "to comprise an indication," in the case of the '504 patent, or "to indicate," in the case of the '211 patent, that "the domain name service system supports establishing a secure communication link." Under the Court's construction, the term "secure communication link" requires "a direct communication link that provides data security and anonymity." D.I. 262; *see also VirnetX, Inc. v. Cisco Sys. Inc.*, 767 F.3d 1308, 1317–19 (Fed. Cir. 2014). As such, VirnetX was required to show an "indication" that, among other things, indicates support for a "***direct***" communication link that provides both "data security and ***anonymity***." 4/3/18 PM Tr. 148:14–149:19. VirnetX, however, wholly failed to present sufficient evidence that the redesigned FaceTime servers—the alleged "domain name service system"—provide such an indication. Apple is thus entitled to JMOL of non-infringement.

VirnetX, through its expert Dr. Mark Jones, alleged that the claimed "domain name service system" was met by, collectively, Apple's FaceTime invitation server, push notification servers, and registration database. 4/3/18 PM Tr. 147:9–17. Dr. Jones contended that the "secure

1

communication link" of the asserted claims was the direct peer-to-peer communication link between two devices conducting a FaceTime call. *Id.* at 117:1–4. And Dr. Jones further alleged that the "accept push" message returned from the FaceTime invitation server to the caller satisfied the claimed "indication" of support for that link. *Id.* at 121:2–16.

The record, however, refutes any contention that the "accept push" message is an indication of support for a "direct" communication link. Before April 2013, in the original version of FaceTime (adjudicated in the earlier -417 Action and not at issue in this trial), the accept push message sent by the FaceTime servers to the caller included the IP address of the callee. 4/4/18 AM Tr. 48:18–22. As Dr. Jones conceded, it was this IP address that allowed the caller to attempt to establish a direct peer-to-peer connection with the callee. *Id.* at 48:23–49:5.

It is undisputed, however, that in April 2013, Apple redesigned FaceTime by zeroing out— effectively removing—the callee's IP address from the accept push message. 4/3/18 PM Tr. 167:6– 11. This change alone deprived the calling device of any information indicating that FaceTime supported establishing a direct peer-to-peer communication link with the callee device.  *Id.* at 167:23–168:7.  And, tellingly, this change alone had the effect of directing all FaceTime calls through a relay server, an ***indirect*** connection that the parties agree does not infringe. *Id.* at 162:8– 12. As a result, Dr. Jones was forced to admit that at the time this change was made to the FaceTime servers in April 2013, the accept push message "would not satisfy [the] requirements of the claims to be an indication of support" for a direct communication link. *Id.* at 167:23–168:11. As Dr. Jones conceded, for a FaceTime "direct call to happen, for voice and video to go over, the caller has to somehow get the callee's IP address." *Id.* at 169:17–20. Removing the callee's IP address from the accept push message in April 2013 thus failed to "indicate" that FaceTime supported establishing a secure communication link, as it was "impossible to have a direct caller-to-callee link." *Id.* at

167:23–168:2.

While VirnetX agreed that FaceTime did not infringe from April to September 2013, VirnetX nevertheless contended that subsequent changes to FaceTime in September 2013 resulted in infringement. The record demonstrates otherwise. Although Apple did release a software update in September 2013 that allowed FaceTime *clients* to establish peer-to-peer connections for FaceTime calls under certain circumstances, it was undisputed that this September 2013 change only affected the software of FaceTime *clients*, not the software of FaceTime *servers*. *Id.* at 168:12–20. Importantly, even after the September 2013 client update, the accept push message sent by the FaceTime servers—the alleged "indication"—continued to omit the callee's IP address, the one piece of information in the accept push message that indicated to the caller that FaceTime could support a direct call with the callee. *Id.* at 168:21–25; 4/4/18 AM Tr. 40:16–22. Based on this undisputed fact alone, Apple is entitled to JMOL.

Although there are two ways in which FaceTime *clients* can start a direct peer-to-peer connection after September 2013, neither provides a legally sufficient basis to sustain the jury's verdict. First, once the accept push message is received by the caller, the *callee* can send its IP address to the caller in a so-called "ICE" request in a communication that does ***not*** go through the FaceTime servers. 4/3/18 AM Tr. 108:17–110:1. Dr. Jones admitted that this IP address is sent by the *callee*, and is not part of the accept push message asserted to be the claimed "indication":

> Q. Okay. And that IP address that's sent from the callee to the caller is not in the accept message that you point to as the indication in the claims. Right?
>
> A. That's correct.

4/4/18 AM Tr. 49:17–20. Second, communicating FaceTime clients can start a peer-to-peer connection by exchanging IP addresses over an already-established *relay* connection. 4/3/18 AM Tr. 110:13–111:7. Again, Dr. Jones conceded that in this situation the *callee* sends its IP address

to the caller via the relay server, *not* via the FaceTime server asserted to be part of the claimed "domain name service system" and not as part of the accept push message alleged to be the claimed "indication." *Id.* at 111:8–14. In either situation, because the alleged "indication"—the accept push message sent by the FaceTime server—does not include the callee's IP address, the FaceTime server can *never* indicate to the caller that it supports establishing a direct peer-to-peer connection.

Indeed, Dr. Jones agreed that "the accept push message that is sent to the calling phone does not have the IP address of the callee," 4/10/18 Tr. 79:9–11, and that "for the caller to initiate a call to the callee, *the caller needs the callee's IP address*." *Id.* at 79:16–19. Dr. Jones was thus forced to admit that the accept push message does not provide the caller with enough information to initiate a direct FaceTime call to the callee:

> Q. So *based on the contents of the accept message alone that you say is the claimed indication from the server, the caller can't initiate a direct FaceTime call to the callee.* Correct?
>
> A. *That's correct.*

*Id.* at 79:24–80:2. Because Dr. Jones *only* identified the accept push message as the claimed "indication," his admissions are fatal to VirnetX's claims of infringement.

Although Dr. Jones relied on other information in the accept push message (*e.g.*, push tokens, session tokens, an accept command, and certificate information), he never even attempted to explain how any of this information "indicat[ed]" that the accused FaceTime servers support establishing a *direct* communication link, as opposed to an *indirect* communication link. 4/3/18 PM Tr. 121:5–122:10, 123:8–25. As Dr. Blaze explained, all of this information is equally applicable to indirect relay connections, and thus cannot provide any indication of support for establishing a direct communication link. 4/9/18 AM Tr. 20:9–22:1. No contrary evidence exists.

Moreover, VirnetX's contention that the accept push message after September 2013 provides the claimed indication cannot be squared with its concession that the pre-September 2013

4

version did not. The agreed non-infringing accept push message pre-September 2013 and the accused post-September 2013 version differed in only one way: the inclusion of the callee's "key certificate" in the latter version. 4/4/18 AM Tr. 67:24–68:5. But it was undisputed that the key certificate is merely used to encrypt the audio/video data in all FaceTime calls—whether peer-to-peer or relay—and has ***nothing to do with whether a call uses a direct or indirect connection***. 4/4/18 AM Tr. 50:7–17, 51:8–21, 73:17–74:14; 4/9/18 AM Tr. 20:9–22:1. It thus "indicate[s]" ***only*** that FaceTime supports providing "data security." As discussed above, the "indication" must indicate that the system supports a link that is direct and provides data security and anonymity. *See* D.I. 262. The accept message at best indicates that FaceTime supports a link that provides data security—nothing indicates that FaceTime supports a communication link that is "direct" or "anonymous." *See infra* § I.A.2. As such, because the key certificate pertains equally to direct and indirect FaceTime calls, it cannot provide an indication of support for a ***direct*** communication link. 4/6/18 AM Tr. 82:4–19, 84:5–13; 4/9/18 AM Tr. 20:9–22:1. Apple is entitled to JMOL.

## 2.     No Basis Exists from Which a Jury Could Reasonably Find That FaceTime Supports Establishing a "Secure Communication Link"

Apple understands the Court precluded Apple from presenting arguments identical to those presented in the -417 Action and decided against Apple (4/2/18 AM Tr. 17:1–20:22), and accordingly filed an offer of proof that, if admitted, would show that the alleged secure communication link in FaceTime does not provide the anonymity required by the Federal Circuit's construction of "secure communication link." D.I. 677; 4/2/18 AM Tr. 19:15–21, 20:2–23. In light of the evidence in Apple's offer of proof, JMOL of no infringement by FaceTime should be granted on this independent basis. Apple raises the issue here to preserve it for appeal.

## 3.     No Basis Exists from Which a Jury Could Reasonably Find that FaceTime Contains a "Domain Name Service System"

Each asserted claim of the '504 and '211 patents requires a "domain name service system."

Immediately before the January 2016 consolidated trial, the Court held over Apple's objection that "domain name service system" did not incorporate the Court's construction of "domain name service." 4/10/18 Tr. 128:10–15. Apple respectfully submits that this holding is incorrect because it improperly eliminates "domain name service" from "domain name service system," rendering the latter term meaningless. D.I. 373. Properly construed, the claimed "domain name service system" is required to "return[] an IP address for a requested domain name to the requester." D.I. 180 at 25. Redesigned FaceTime lacks a "domain name service system" under such a construction because Apple undisputedly changed FaceTime "to zero out or effectively remove the callee IP address." 4/3/18 PM Tr. 167:9–11; *see also id.* at 169:6–8 ("Q. Okay. And after the change in September, still the accept push message did not have the IP address of the callee? A. Correct."). Apple is entitled to JMOL of no infringement on this independent basis.

### B.    Apple Is Entitled to JMOL of No Infringement by VPN On Demand

#### 1.    No Basis Exists from Which a Jury Could Reasonably Find That VPN On Demand in iOS 7–8 Infringes the Asserted Claims

Each asserted claim of the '135 and '151 patents requires the automatic initiation of a VPN based on a DNS request. VirnetX wholly failed to show that VPN On Demand in iOS 7 onwards ("VOD") met this requirement. To the contrary, the record at trial conclusively demonstrated that VOD initiates VPNs not based on DNS requests, but rather based on location. Because none of the evidence presented at trial provided a legally sufficient basis to determine that VOD infringes the asserted claims, Apple is entitled to JMOL of non-infringement.

The '135 and '151 patents describe a common invention: the automatic initiation of a VPN in response to a DNS request. *See, e.g.*, '135 patent at claim 1; '151 patent at claim 13. In prior-art systems, DNS requests were sent to conventional DNS servers, which returned an IP address for the requested domain name. *See* '151 patent at 37:1–10. The patents introduce a "DNS proxy" into

this scheme that intercepts DNS requests *before they are sent to a DNS server* and automatically creates a VPN if the DNS request corresponds to a secure site. *See id.* at 37:60–62; Fig. 27. As shown in Figure 27, upon intercepting a DNS request, the DNS proxy determines—based on that request—whether a secure site is requested. *Id.* at 38:36–40. If so, a VPN is initiated. *Id.* By basing the determination *on the DNS request itself*, the patented system avoids the alleged prior-art problem of sending DNS requests for secure sites to a public DNS server, which the patents claim "would hamper anonymous communications on the Internet." *Id.* at 37:19–20. A DNS request is passed to the public DNS server *only* if it requests an unsecure site. *Id.* at 38:40–43.

The asserted claims also reflect this flow. *See id.* at claim 13; '135 patent at claim 1. First, the claims determine, based on a DNS request, whether the site requested is a secure server or secure web site. Next, based on that determination, the claims follow one of two steps: (1) when the request is for a secure server or secure web site, automatically creating a VPN or secure channel or (2) when the DNS request is not for a secure server or secure web site, forwarding the request to a DNS function. *See* '151 patent at claim 13; '135 patent at claim 1.

The previous version of VOD in iOS 3–6 contained the "Always" mode of operation, which was found to be infringing in the earlier -417 Action and was not at issue here. 4/3/18 PM Tr. 194:8–11. The "Always" mode would check to see whether a requested site in a DNS request was on a user-configurable list and, if so, as the name suggests, *always* create a VPN without sending a DNS request to a DNS server. *Id.* at 195:4–14. The "Always" mode ignored location: it would create a VPN without regard to whether the user was inside or outside a private network. *Id.* at 195:13–196:3. In contrast, the "If Needed" mode of VOD in iOS 3–6—the mode agreed *not* to infringe (4/3/18 AM Tr. 77:22–78:2)—would create a VPN only if one was needed to connect to the site (and only after a DNS request was sent to a DNS server). *Id.* at 76:6–10; 4/6/18 PM Tr.

7

151:13–24. The "If Needed" mode was location-based: it would create a VPN if a user was *outside* the private network, but *not* if a user was *inside* the private network. 4/6/18 PM Tr. 151:13–24.

With the release of iOS 7, Apple redesigned VOD, removing the Always mode. *See, e.g.*, *id.* at 161:5–7. The trial record demonstrated that, like the prior "If Needed" mode, the redesigned version of VOD is location-based—it creates a VPN only if a user needs one to connect to the requested site. 4/3/18 PM Tr. 193:18–194:1; 4/4/18 AM Tr. 9:4–8. As Dr. Jones admitted, redesigned VOD will create a VPN if a user is outside a private network and needs to access an internal resource, but not if a user is inside the private network. 4/4/18 AM Tr. 7:17–9:8. Moreover, Dr. Jones conceded that redesigned VOD transmits *every* DNS request to a DNS function regardless of the security of the site. *Id.* at 17:4–21. And Dr. Jones expressly admitted that the operation of VOD without the optional HTTPS probe *does not infringe any of the asserted claims*. 4/3/18 PM Tr. 177:23–178:6; *see also* 4/10/18 Sealed Tr. 84:22–25.

This admission is fatal to VirnetX's claims of infringement because the optional HTTPS probe—the sole basis for VirnetX's theory—does not alter VOD's fundamental operation. Indeed, the purpose of the optional probe is to make a further determination of the user's location, *i.e.*, whether the user is inside or outside the private network. 4/3/18 AM Tr. 80:4–11; 4/3/18 PM Tr. 185:1–23. Thus, VOD—with the optional HTTPS probe—cannot meet the claim language. *First*, VOD does not "determin[e] whether *a DNS request* sent by a client corresponds to a secure server" or site, because the decision to start a VPN is based on something other than a DNS request. To the extent any determination is made, it is based on the failure of the *HTTPS probe*, not the *DNS request*. That probe failure occurs, as Dr. Jones admitted, only after a DNS request is made and returns a successful result. 4/10/18 Sealed Tr. 92:3–25. This functionality does not—and cannot—literally satisfy the limitation of "determining whether *a DNS request* sent by a client corresponds

to a secure server" as a matter of law.

Although Dr. Jones alleged that the HTTPS probe determined whether the requested site was secure (4/3/18 AM Tr. 87:12–22), the trial record wholly refuted that allegation.  The HTTPS probe cannot determine whether a requested site is secure; indeed, the probe does not access a requested site but rather a wholly separate probe server. *Id.* at 80:4–81:4; 4/6/18 PM Tr. 169:6–170:16. It does so to determine merely whether the private network is reachable from the location of the requesting device. 4/6/18 PM Tr. 164:13–166:2, 170:10–172:8, 201:19–204:3; 4/9/18 AM Tr. 36:7–38:12, 44:13–17; 4/9/18 AM Sealed Tr. 40:3-43:18. And the HTTPS probe's failure or success depends only on whether the requesting device is on the same private network as the probe server. 4/3/18 PM Tr. 185:24–186:3. Accordingly, to the extent the optional HTTPS probe performs any "determination," it is a determination as to the ***location*** of the requesting device relative to the private network, not a determination as to any requested server's ***security***. Dr. Jones ultimately conceded this point:

> Q. And so you could have the same server with the same website, right, both of the people authorized by the same company to access that server, and this person inside will not get a VPN and this person outside will. Right?
>
> A. Yes.
>
> Q. And the only difference between those people is that one is inside and one's outside. That's why you get a different result. Right?
>
> A. Correct.

4/4/18 AM Tr. 63:24–64:7. Under Dr. Jones's infringement theory, the same server would necessarily be viewed as "secure" and "not secure" at the same time based entirely on the location of the requesting device (whether outside or inside the private network). That absurd contention cannot sustain the jury's verdict.

Although Dr. Jones also suggested that the probe could be misconfigured to always fail

and thus always result in a VPN, he did not base his infringement analysis on such misconfiguration and agreed that he was unaware of Apple ever telling anyone to configure the probe to fail. 4/4/18 AM Tr. 66:3–7. Nor was he aware of Apple instructing customers that setting up the optional probe to always fail is a normal configuration. *Id*. at 66:8–11. In any case, even in a hypothetical situation where the probe were misconfigured, redesigned VOD would still not determine whether a ***DNS request*** is requesting access to a secure web site. Instead, VOD would still transmit a DNS request to a DNS server for all requested domain names, as Dr. Jones agreed. 4/3/18 AM Tr. 95:17–22. As such, the VPN's creation would be based on the ***DNS response*** or the results of the ***HTTPS probe***, not the DNS request.

***Second***, VOD does not "initiat[e] the VPN" or "create a secure channel" ***in response to determining that the DNS request is requesting access to a secure site or server***. Claim 1 of the '135 patent requires "in response to determining that the DNS request in step (2) is requesting access to a secure target web site, automatically initiating the VPN between the client computer and the target computer" and Claim 13 of the '151 patent requires "when the intercepted DNS request corresponds to a secure server, automatically creating a secure channel between the client and the secure server." But, as discussed above, VOD does not make a determination on a DNS request, but rather on the location of the user attempting to access the site. 4/3/18 PM Tr. 193:18–194:1. VOD will set up a VPN if the user is outside the private network, but "***no VPN will be started***" if the user is inside that network. 4/10/18 Sealed Tr. 85:24–86:2. It was undisputed that even if a site is secure, ***VOD will not start a VPN when the user is inside the private network***. That fact unequivocally demonstrates that redesigned VOD does not initiate a VPN or create a secure channel in response to a determination based on a DNS request that a site is secure.

***Third***, VOD does not "forward[] the DNS request to a DNS function that returns an IP

10

address of a nonsecure computer" "when the DNS request does not correspond to a secure server" as required by claim 13 of the '151 patent, because it *always* forwards a DNS request to a DNS function for all requests. 4/4/18 AM Tr. 17:11–14. Indeed, VOD forwards the request to a DNS function before any alleged "determining" under VirnetX's theory takes place, as the HTTPS probe is checked *only after* a DNS query is made and the results of that query are returned. 4/10/18 Sealed Tr. 92:3–25; DTX162. Because VOD never conditions a DNS query on access to a non-secure site, it cannot infringe Claim 13. Apple is entitled to JMOL of non-infringement.

## 2.   VirnetX's Assertions That Redesigned VOD Is Capable of Infringement Do Not Establish Infringement

VirnetX premised its infringement theory on a specific—and *optional*—operating scenario. VirnetX, however, offered no evidence that anyone employed this specific scenario and thus configured or used VOD in the allegedly infringing manner. At most, VirnetX presented "only evidence of capability to infringe, [which] did not amount to evidence of actual direct infringement." *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1328 (Fed. Cir. 2010). As the Federal Circuit has held, "[u]nless the claim language only requires the capacity to perform a particular claim element . . . it is not enough to simply show that a product is capable of infringement; the patent owner must show evidence of specific instances of direct infringement." *Id.* at 1329 (citation omitted). The claims here are not drawn to mere capability: they all require actual performance of the claimed method steps ('135 patent) or "computer readable instructions that, when executed, cause a data processing device to perform" claimed steps ('151 patent). JMOL of no infringement is warranted for this reason alone.

The undisputed evidence showed that a user can configure the redesigned VOD to operate in a variety of ways. *See, e.g.*, 4/3/18 PM Tr. 178:2–179:1; 4/10/18 Sealed Tr. 82:3–85:2, 87:1–5; DTX162. VirnetX's infringement allegations focused on a single specific scenario in which VOD

11

is operated in the Evaluate Connection mode, a domain name is checked against a list, a DNS query is made, an address is successfully returned, an HTTPS probe is configured, and that HTTPS probe fails. 4/10/18 Sealed Tr. 92:3–25. Indeed, Dr. Jones confirmed that use of the Evaluate Connection mode without the HTTPS probe would *not* infringe VirnetX's patents:

> Q. Okay. And you agree from an operating scenario, *the use of Evaluate Connection without the HTTPS probe does not use the VirnetX patents*. Right?
>
> A. *That's correct*.

4/3/18 PM Tr. 177:23–178:1; *see also id.* at 178:2–6 ("Q. Okay. And so your opinion in this case with regard to Evaluate Connection in the current version of VPN On Demand is that the infringement depends on the existence of the optional HTTPS probe. Right? A. Yes."). But the HTTPS probe functionality is *optional*, as Dr. Jones admitted. 4/3/18 AM Tr. 80:16–18.

At trial, however, VirnetX failed to identify *a single instance* of this scenario being performed by Apple or its customers. Although Dr. Jones ventured that Apple itself directly infringed "through their use of *VPN On Demand*, for example, in testing or in their own networks" (4/3/18 PM Tr. 131:10–12 (emphasis added)), VirnetX offered no actual evidence of Apple's use of the *accused implementation* of VPN On Demand, namely in the "Evaluate Connection" mode with the HTTPS probe configured (or misconfigured), let alone that Apple used or tested such an implementation in the United States. Nor did Dr. Jones's cursory reference to PX1018 (4/3/18 PM Tr. 131:13–20) fill the gap: the document is only a "draft" of a "test plan," which proposes the use of "one of . . . three cases" depending on a customer's statement of "which of the following use-cases best fits your needs." PX1018 at 1. Only one proposed case, "Case 3," mentions the probe that Dr. Jones accused of infringement. *Id.* at 4. VirnetX offered no evidence that this "draft" test plan was ever finalized, that it was ever actually carried out, or that any customer actually selected or used "Case 3" in the United States. Moreover, even if someone did test Case 3, Dr. Jones

12

provided no evidence that this test used an HTTPS probe *that failed*, as his theory requires.

VirnetX's conclusory allegations, ***unsupported by any evidence***, cannot provide sufficient "evidence of actual direct infringement." *Fujitsu*, 620 F.3d at 1328. Indeed, the record is devoid of evidence that Apple or its customers used VOD in the Evaluate Connection mode with the HTTPS probe. And Dr. Jones never even alleged that anyone actually used the HTTPS probe, let alone did so in an infringing way. Although evidence existed that the probe could address a specific network configuration known as "dual-facing servers" (4/6/18 PM Tr. 169:2–18; 4/9/18 AM Tr. 46:24–48:10), VirnetX introduced no evidence that anyone employed such a configuration. Moreover, even such a configuration would not mandate use of the probe—undisputed evidence demonstrated that other techniques exist to address this configuration, *e.g.*, requiring the use of a company's internal DNS servers. 4/9/18 AM Tr. 48:11–23.

Without evidence that Apple used VOD in the infringing manner, VirnetX cannot succeed in showing that ***Apple*** has directly infringed the '135 or '151 patents. Moreover, given that VOD will not necessarily infringe even under VirnetX's theories, VirnetX can only succeed in showing that ***Apple's customers*** directly infringe with "evidence of specific instances of direct infringement." *Fujitsu*, 620 F.3d at 1328–29 (affirming non-infringement where testimony and manuals "only show that the products are capable of infringing, they do not provide evidence of direct infringement"); *see also Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1570 (Fed. Cir. 1996) (rejecting the argument that "a device which is CAPABLE of infringing use does not escape infringement although not actually used in an infringing manner," where the claims were written to cover actual use) (emphasis in original). VirnetX's failure to provide any such evidence renders its allegations of infringement of the '135 and '151 patents deficient as a matter of law.

Moreover, even if the Court were to determine that the jury could have reasonably inferred

infringement by Apple's customers, no basis exists for holding Apple liable because VirnetX never proved the additional facts needed to show indirect infringement. *See infra* § I.D.

### C. Apple Is Entitled to JMOL of No Infringement on iMessage

Apple is entitled to JMOL on its counterclaim that the iMessage feature in iOS 5–8 and OS X 10.8–10.10 does not infringe, directly or indirectly, claims 1, 2, 5, and 27 of the '504 patent and claims 36, 47, and 51 of the '211 patent. *See* D.I. 219. Neither VirnetX's affirmative claim of infringement by iMessage nor Apple's counterclaim for a declaratory judgment of non-infringement regarding iMessage has ever been dismissed, and both parties included infringement by iMessage as an "issue[] of fact that remain[ed] to be litigated" in the pretrial order. D.I. 622 at 18 (VirnetX's statement), 20 (Apple's statement); *Branch-Hines v. Hebert*, 939 F.2d 1311, 1319 (5th Cir. 1991) ("It is a well-settled rule that a joint pretrial order signed by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial[.]"). VirnetX bore the burden of proving infringement for both its affirmative claim and Apple's counterclaim. *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 134 S. Ct. 843, 849 (2014). Despite this, VirnetX decided not to present any evidence relating to iMessage at trial. Apple is accordingly entitled to JMOL of no infringement by iMessage. *See Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606, 615 (5th Cir. 1999).

To avoid burdening the Court with this issue, Apple sought VirnetX's agreement to a stipulated dismissal with prejudice of VirnetX's infringement claim and Apple's non-infringement counterclaim regarding iMessage. VirnetX refused, arguing that the Court lacks subject-matter jurisdiction over the counterclaim. VirnetX is incorrect. For years, VirnetX has vigorously accused iMessage of infringement through its complaint, expert reports, testimony during the previous consolidated trial, and the pretrial order for this very trial. It also refused to dismiss these claims with prejudice or provide a covenant not to sue. VirnetX's conduct "can be reasonably inferred as

14

demonstrating intent to enforce a patent," thus creating subject-matter jurisdiction over Apple's counterclaim for a declaration of non-infringement. *Hewlett-Packard Co. v. Acceleron LLC*, 587 F.3d 1358, 1363 (Fed. Cir. 2009). VirnetX's last-minute choice to present no evidence regarding iMessage at trial does not moot Apple's counterclaim, and certainly does not permit VirnetX to avoid judgment only to take another shot at iMessage in the future. The Court should grant JMOL that the iMessage feature in iOS 5–8 and OS X 10.8–10.10 does not infringe.

### D.      Apple Is Entitled to JMOL of No Indirect Infringement

At trial, VirnetX alleged that Apple both directly and indirectly infringed the asserted claims. Even if VirnetX could demonstrate direct infringement by a third party, to sustain indirect infringement VirnetX must also prove "that the alleged infringer ***knowingly*** induced infringement and ***possessed specific intent*** to encourage another's infringement." *ACCO Brands, Inc. v. ABA Locks Mfr. Co.*, 501 F.3d 1307, 1312 (Fed. Cir. 2007). Mere knowledge of the patents-in-suit cannot satisfy this requirement. *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 765–66 (2011). Yet the entire extent of VirnetX's evidence of Apple's specific intent to induce infringement is the following vague, unsupported testimony from Dr. Jones:

> Q. What evidence can you show the jury that Apple intended its customers to infringe?
>
> A. Well, this is deposition testimony from Mr. Jamie Wood, who is an Apple engineer, and he was asked whether it was possible to replicate the Always feature of VPN On Demand. In other words, the new version. And he indicated that yes, that is possible.
>
> ***
>
> Q. And what evidence can the jury consider to find that Apple specifically intended users to infringe?
>
> A. One example would be that Apple for a period of time -- so they weren't doing the direct or peer-to-peer calls, as I showed in that timeline, but eventually went back to doing the direct calls in iOS 7.

15

4/3/18 PM Tr. 132:20–133:1, 135:22–136:2. This is insufficient to meet VirnetX's burden as a matter of law. Dr. Jones fails to point to any evidence showing that Apple gives its customers instructions to use the accused features in an allegedly infringing manner. Moreover, the accused features have numerous non-infringing uses. For example, for redesigned VOD, *any* use of the feature without the HTTPS probe is non-infringing. *Id.* at 173:9–175:2, 177:7–178:1. Nor did VirnetX point to any evidence that Apple instructs its customers to configure VOD to "replicate the Always feature" as Dr. Jones contends. Indeed, while Dr. Jones suggested that redesigned VOD could be configured to "replicate" the old Always feature, Dr. Jones did not identify any such implementations. Dr. Jones also conceded that he was not aware of Apple ever telling any customers that they could or should misconfigure VOD as he contended. 4/4/18 AM Tr. 66:3–11.

Moreover, no evidence exists from which a jury could reasonably find that Apple was aware or willfully blind to the fact that use of its products would constitute patent infringement. *Commil USA, LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920, 1928 (2015). VirnetX and Dr. Jones have no evidence that Apple took affirmative steps to avoid learning of putative infringement. *See* 4/3/18 PM Tr. 132:10–136:2. Quite the opposite—Apple took affirmative steps to redesign its products to avoid infringement. 4/6/18 AM Tr. 68:24–69:15; 4/6/18 PM Tr. 161:5–162:18.

With respect to contributory infringement, VirnetX alleged contributory infringement in its complaint, D.I. 207 ¶¶ 20, 26, 44, 50, and continued to generally assert "indirect[] infringe[ment]" in the pretrial order. D.I. 622 at 18. Apple counterclaimed for a declaratory judgment of no contributory infringement. D.I. 219. VirnetX proffered no evidence of contributory infringement, thus JMOL of no contributory infringement is warranted. *Skidmore*, 188 F.3d at 615.

16

## II.     VirnetX Failed to Present Sufficient Evidence to Support the Damages Award[1]

No reasonable jury could have awarded $502,567,709 in damages, yet the jury in this case did so based on VirnetX's legally and factually flawed damages model. VirnetX's damages model is based on per-unit royalty rates derived from six VirnetX licenses. Despite the Federal Circuit's exhortation that "[t]estimony relying on licenses ***must account*** for . . . distinguishing facts when invoking them to value the patented invention," *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014) (emphasis added), neither Mr. Weinstein nor the jury accounted for the vast differences between those six licenses and the hypothetical license between VirnetX and Apple. Every license on which Mr. Weinstein relied (2010 Microsoft, Aastra, Mitel, NEC, Siemens, and Avaya) was for many more patents and for longer terms than the hypothetical license. Five (Aastra, Mitel, NEC, Siemens, and Avaya; collectively, "VoIP Licenses") were for far less complex products than Apple's. Four (Aastra, Mitel, NEC, and Siemens) resulted in royalties that were substantially less than the cost of litigation and expressly ***excluded*** products like Apple's from their definition of royalty-bearing "licensed products." 4/4/18 PM Tr. 122:1–125:3, 4/5/18 AM Tr. 55:16–57:9, 134:17-135:6; 4/9/18 PM Tr. 195:19-196:3, 234:14–240:8. Yet Mr. Weinstein made no adjustments to the royalty rates he derived to account for these differences and provided the jury with no roadmap to do so.

In addition, in cases such as this which involve accused products with multiple features, a patentee "must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features[.]" *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) (quoting *Garretson*

---

[1] As explained in § V.B, *infra*, because the United States Patent and Trademark Office has concluded that every asserted claim is "unpatentable" over the prior art, *i.e.*, there are no differences between the claims and the prior art, no damages should be awarded.

*v. Clark*, 111 U.S. 120, 212 (1884)). Although Mr. Weinstein claims VirnetX's licensing policy (upon which the VoIP licenses are supposedly based) is apportioned, 4/5/18 AM Tr. 40:25–41:23; PX411, Mr. Weinstein admittedly did not know *how* the policy was "apportioned." 4/5/18 AM Tr. 121:15–25. And even accepting Mr. Weinstein's contention that he excluded certain licensed products in his per-unit royalty rate calculations, that says nothing about whether the royalty rate he derived is apportioned for the licensed products he did include. *Id.* at 55:25–57:9, 85:11–19. Mr. Weinstein failed to perform any apportionment and his mere recitation of the word cannot save his methodology or the verdict based on it.

Indeed, Mr. Weinstein's failure to apportion is evident in his derivation of his per-unit rates from VirnetX's entire-market-value-based licenses and his application of the exact same royalty rate to VOD and FaceTime. There is no evidence VirnetX's patented technology drove demand for sales of any product, including Apple's. 4/9/18 PM Tr. 172:1–4; 4/5/18 AM Tr. 98:22–100:23; 4/5/18 AM Sealed Tr. 77:2–6 (explaining ██████████████████████████ ██ FaceTime feature, which encompasses more than the patented technology); 4/9/18 PM Tr. 168:22–169:1. Nor is there any evidence that Apple would have agreed to pay the same royalty for these features, particularly when VirnetX's VOD infringement theory related to a specific configuration that VirnetX has no evidence was ever implemented.

Accordingly, VirnetX's damages evidence fails as a matter of law to support the jury's damages award because it was not based on sufficiently "sound economic and factual predicates." *LaserDynamics*, 694 F.3d at 67 (internal quotation marks omitted). Even assuming infringement by *both* redesigned FaceTime and VOD, at most, the record in this case supports damages of $25.1 million. Because the jury's damages award is predicated on legally insufficient grounds, Apple's motion for JMOL should be granted.

18

### A.   Mr. Weinstein's $1.20 Per-Unit Rate Cannot Support the Verdict Because It Is Unapportioned and Based on Non-Comparable Licenses

Mr. Weinstein's $1.20 per-unit rate grossly overstates the value of the patents-in-suit by using an unreliable and unapportioned methodology that cannot support a jury verdict. *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law . . . it cannot support a jury's verdict."). "[T]he ultimate reasonable royalty award must be based on the ***incremental value*** that the patented invention adds to the end product. In short, apportionment." *Commonwealth Sci. & Indus. Research Org. v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015) (internal quotation marks omitted; emphasis added). Neither Mr. Weinstein nor the jury apportioned the $1.20 per-unit royalty rate to account for the differences between that royalty rate and the hypothetical VirnetX-Apple license.

***The licensees received greater IP rights for a longer term***. At the hypothetical negotiation, Apple and VirnetX are bargaining over a license to four U.S. patents for less than five years. However, every license from which Mr. Weinstein derived his per-unit royalty rate is for a far longer term and for far more patents. Each agreement grants a license through the life of the patents, giving each licensee rights for over 15 years. The VoIP Licenses include 12 to 15 patents in addition to the four that Apple and VirnetX are negotiating over. PX406–408 at Ex. A; PX1085–1086 at Ex. A; 4/5/18 AM Tr. 131:18–132:6. Mr. Weinstein admitted that these additional 12 to 15 patents contribute value to the licenses. 4/5/18 AM Tr. 133:2–15; *see also* 4/9/18 PM Tr. 195:19–196:3 (Avaya license signatory testifying all licensed patents were important to avoid future litigation). And the 2010 Microsoft Agreement includes rights to at least 64 more U.S. and foreign patents and patent applications than what Apple and VirnetX are negotiating over. PX409 at Ex. A; 4/5/18 AM Tr. 110:21–111:8. Mr. Weinstein admitted that Microsoft paid to get rights

to VirnetX's foreign patents, VirnetX's foreign patents have value, and Microsoft's foreign sales accounted for half of its licensed sales. 4/5/18 AM Tr. 108:9–18, 110:25–111:12. Indeed, VirnetX agrees all of these other patents have value: VirnetX's 30(b)(6) witness on licensing testified that each of VirnetX's patents is "equally important" and VirnetX's "life and blood." *Id.* at 113:11–24.

Each license Mr. Weinstein relied on therefore includes rights for a greater duration than Apple would be able to get at the hypothetical negotiation, but Mr. Weinstein and the jury did not adjust for these undisputed differences. 4/5/18 AM Tr. 111:23–112:1; 132:10–13, 132:7–9.

*The VoIP Licenses cover products that are far less complex and to which VirnetX's patents make a greater contribution, than Apple's feature-rich devices.* Apple's devices contain many more features and are much more complex than those subject to the VoIP Licenses, as Mr. Weinstein admitted. 4/5/18 AM Tr. 127:24–131:14. Mr. Weinstein's per-unit rate, however, is the same regardless of the product at issue and how many features it possesses. 4/5/18 AM Tr. 92:15–24. Thus, just as he did in the November 2012 417 Action, Mr. Weinstein "failed to apportion value between the patented features and the vast number of non-patented features contained in the accused products." *VirnetX*, 767 F.3d at 1329. He also failed to account for the presence of the many other unpatented elements needed to run FaceTime, such as video encoding, audio encoding, a video display, microphone, speaker, and battery. 4/5/18 AM Tr. 101:7–105:6.

*The VoIP Licenses were entered into to avoid costly litigation.* Using "prior settlement agreements to prove the amount of a reasonable royalty is questionable" because "litigation costs still to come at the time of settlement may loom large in parties' decisions to settle." *Prism Techs LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1369–70 (Fed. Cir. 2017); *LaserDynamics*, 694 F.3d at 77. Mr. Weinstein agreed that "the value of a license entered into in settlement of litigation may just represent the value to the defendant of making a lawsuit go away[.]" 4/5/18 AM Tr. 134:24–

135:3. He also agreed that the Aastra, NEC, Siemens, and Mitel licenses involve low royalties far below the cost of litigation. *Id.* at 135:4–6; *see also* 4/4/18 AM Tr. 113:21–114:4. As such, these licenses do not reflect the value of the patented technology; instead, they reflect the value of avoiding costly litigation with VirnetX. Mr. Binns confirmed this was also the case for Avaya. 4/9/18 PM Tr. 195:19–196:3.

   ***Under the VoIP Licenses, no royalty would be due on the accused Apple products***. The Mitel, Siemens, and Aastra licenses contain definitions of "licensed products" that require no royalties for VoIP phones that are not sold with IP PBX servers. PX406 at VX00509716–17; PX407 at VX00679543; PX1085–23; 4/9/18 PM Tr. 239:9–240:11. The NEC license's royalty calculation formula has the same effect. PX408 at VX00689391–96; 4/9/18 PM Tr. 234:1–239:8. In other words, as long as the VoIP phones ███████████████████████████████

████████████████████████████████████████████████████████████████████████████████.

PX406 at VX00509716–17; PX407 at VX00679543; PX1085–23. And the Avaya license covers

████████████████████████████████████████████████████████████████████████████████.

PX1086 at 2–3. Apple does not sell IP PBX servers and FaceTime and VOD do not interact with an IP PBX or a public switched telephone network. 4/9/18 PM Tr. 236:10–11, 237:4–6, 239:16–240:14. Thus, the jury applied a $1.20 per-unit royalty based on licenses under which any royalty due for Apple's products would be ***zero***.

   ***Mr. Weinstein devalued the Microsoft license***. Mr. Weinstein compounded his errors by treating these licenses as if they were on equal footing with the Microsoft Agreement. The 2010 Microsoft Agreement covered 2 billion units, involved comparable licensed products, and accounted for 99% of VirnetX's licensed units and 97% of VirnetX's license revenue. 4/5/18 AM Tr. 108:19–109:2; *id.* at 125:21–126:15; 4/4/18 PM Tr. 97:25–98:4. The 2010 Microsoft

Agreement covers feature-rich products that are comparable to Apple's accused products, 4/5/18 PM Tr. 144:17–147:5, and Mr. Weinstein admitted that Microsoft, unlike Avaya, NEC, Siemens, and Mitel, actually competes with Apple. 4/5/18 AM Tr. 131:15–17; 4/5/18 PM Tr. 141:12–17. Mr. Weinstein calculated the Microsoft Agreement to have a royalty rate of $0.19 per unit by improperly excluding covered foreign units (and he admitted that the rate actually is $0.10 per unit when foreign units are counted). PX1088.03-2; 4/5/18 AM Tr. 109:3–111:15. Mr. Weinstein also performed no analysis of the differences in the per-unit rates in the original 2010 Microsoft Agreement ($0.10 per unit) and the 2014 Microsoft Amendment ($0.06 per unit) because VirnetX's lawyers told him not to. 4/5/18 PM Tr. 163:7–164:25. Nor did he or VirnetX analyze the differences in the per-unit rates in any of the settlement agreements, or the relationship of the per-unit rate to the relative value of the invention within the licensed product. Instead, Mr. Weinstein's simple average of the six license agreements resulted in a per-unit royalty of $1.20— in other words, Apple would allegedly agree to pay over 2.5 times the royalty Microsoft paid for one-fourth of the units Microsoft licensed. PX1088.3; 4/5/18 AM Tr. 46:21–48:9, 48:23–49:12, 54:5–55:7. In addition, the 2014 Amended Microsoft Agreement covered an additional 2 billion units, but Mr. Weinstein ignored this amendment when calculating damages on counsel's orders. 4/5/18 PM Tr. 163:7–16.  Taking that into account, VirnetX's theory has Apple agreeing to pay over twice what Microsoft paid for one-eighth as many licensed units.

Mr. Weinstein's model utterly failed to "account[] for differences in the technologies and economic circumstances of the contracting parties." *CSIRO*, 809 F.3d at 1303. Because his model is unapportioned, it cannot support the jury's verdict and JMOL should be granted.

### B.  Mr. Weinstein's Recitation of the Word "Apportionment" Cannot Salvage the Verdict

Mr. Weinstein's reliance on VirnetX's licensing policy cannot redeem his flawed analysis.

Mr. Weinstein claimed he did not need to apportion because he relied on Mr. Larsen's testimony concerning VirnetX's licensing policy. 4/5/18 AM Tr. 40:25–41:23. VirnetX's "policy" applies a 1% to 2% royalty rate *to the price of the end product*. PX411 at 27; 4/5/18 AM Tr. 40:25–41:6. Nothing in the policy explains what, if any, apportionment was done to devise that policy. And Mr. Weinstein admitted he did not know how, if at all, VirnetX's licensing policy was apportioned. *Id.* at 121:15–25. Nor is any such analysis in the record.

Even accepting the unsupported claim that VirnetX's licensing policy and, by implication, its VoIP licenses are "apportioned," it does not follow that either is apportioned for Apple's accused products. Apple's devices are admittedly "far, far, more complex" and "have many, many, many more features" than VoIP phones, 4/5/18 AM Tr. 129:23–130:6, but Mr. Weinstein made no adjustment to account for this critical difference. Instead, his per-unit rates are a function of the EMV of the VoIP phones. *Id.* at 45:12–46:17. That is not apportionment, and Mr. Weinstein's speculation that some "apportionment" was done does not constitute substantial evidence the jury could have relied on and therefore JMOL should be granted. *Brooke Grp.,* 509 U.S. at 242; *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1335–36 (Fed. Cir. 2009).

### C. Mr. Weinstein's Testimony Confirms the Jury's Verdict Awards Damages Far Beyond the Claimed Inventions' "Footprint" in the Marketplace

Mr. Weinstein's analysis further seeks damages far beyond the "claimed invention's footprint in the market place." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869–71 (Fed. Cir. 2010). Mr. Weinstein asserted that Apple should pay the same royalty for a given device regardless of which patents were infringed and regardless of which feature infringed. *See* PX1089.3; PX1089.6. FaceTime (a video-conferencing app) and VOD (a VPN connection app) are different features that are accused of infringing different patents in different ways. *See* PX64; PX1098; 4/3/18 AM Tr. 57:21–58:6, 58:20–59:8. And there is no evidence that the "footprint" of VirnetX's

23

'135 and '151 patents in VOD is equal to the "footprint" of VirnetX's '504 and '211 patents in FaceTime, or that Apple would have negotiated the same royalty for VOD as it would have for FaceTime alone. Indeed, Mr. Weinstein's $1.20 per-unit rate is ***more than the $0.99 market price of the standalone FaceTime app***, but he offered no evidence that Apple would pay more than the market price for FaceTime. 4/5/18 AM Tr. 105:7–15.

Mr. Weinstein likewise ignored the limited nature of VirnetX's infringement accusation regarding VOD. VirnetX accuses only a ***single*** implementation of infringement, the HTTPS probe functionality within the "Evaluate Connection" mode. 4/3/18 PM Tr. 173:9–175:2, 177:7–178:1. But the HTTPS probe functionality is ***optional***. *Id.* at 177:7–12. VirnetX's expert, Dr. Jones, was not aware of Apple instructing any customer to configure the HTTPS probe in this way, let alone that any customer did configure it in this way. 4/4/18 AM Tr. 66:3–11. "A defendant's liability for indirect infringement must relate to the identified instances of direct infringement." *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1274 (Fed. Cir. 2004). Given that redesigned VOD has numerous uses that VirnetX does not accuse of infringement, 4/3/18 PM Tr. 173:9–175:2, 177:7–178:1, "[t]he damages award ought to be correlated, in some respect, to the extent the infringing method is used by consumers. This is so because this is what the parties to the hypothetical negotiation would have considered." *Lucent*, 580 F.3d at 1334. Yet Mr. Weinstein simply assumed, without basis, that every Apple product containing redesigned VOD practiced the particular implementation that VirnetX accused of infringement—a proposition VirnetX did not even attempt to prove. VirnetX's assertion that Apple infringed the '135 patent by "testing" redesigned VOD, 4/3/18 PM Tr. 131:10–12, fares no better, as Mr. Weinstein did not offer any testimony about a reasonable royalty for the right to conduct testing. Mr. Weinstein's identical royalty for each feature therefore does not reflect the patents' "footprint in the market place[]" and

24

cannot support the jury's verdict. *ResQNet.com*, 594 F.3d at 869–71. JMOL should be granted.

### D.      Mr. Weinstein's Model Violates the Entire Market Value Rule

In the original 417 Action, Mr. Weinstein applied a 1% royalty rate to the EMV of Apple's accused products. *VirnetX*, 767 F.3d at 1330. That royalty rate was based on six EMV-based licenses and VirnetX's "'policy' of licensing its patents for 1–2%." *Id.* at 1330. The Federal Circuit held that Mr. Weinstein's model violated the EMVR because he failed "to apportion the royalty down to a reasonable estimate of the value of its claimed technology, or else establish that its patented technology drove demand for the entire product." *Id.* at 1329.

Mr. Weinstein repeats that same error here. Mr. Weinstein derives his per-unit rates from VirnetX's percentage-based licenses. 4/5/18 AM Tr. 46:21–48:9; 118:22–119:11; PX1088.3. Mr. Larsen and Mr. Weinstein testified about VirnetX's licensing policy, which includes a 1% to 2% royalty rate on the revenues of licensed products. 4/5/18 AM Tr. 40:25–41:23. But just as in the November 2012 417 Action, VirnetX presented no evidence that its technology drives consumer demand for Apple's end products and the uncontroverted evidence shows that it does not. *VirnetX*, 767 F.3d at 1329; 4/5/18 AM Tr. 98:22–100:23; 4/5/18 AM Sealed Tr. 77:2–6 (explaining ███ ███████████████████████████████████ FaceTime feature, which encompasses more than the patented technology); 4/9/18 PM Tr. 168:22–169:1. VirnetX did not meet the strict requirements of the EMVR, and accordingly the damages verdict cannot stand and JMOL should be granted.

### E.      VirnetX Cannot Be Awarded Double Recovery

The jury's damages award impermissibly awards VirnetX double recovery. *Aero Prods. Int'l, Inc. v. Intex Recreation Corp.*, 466 F.3d 1000, 1017–20 (Fed. Cir. 2006). VirnetX's damages model applied ***a single royalty per accused device***, 4/5/18 AM Tr. 92:15–24, and VirnetX's licensing policy applies a "[r]oyalty fee . . . for every unit shipped with the VirnetX techniques

independent of the usage by the customer." PX1092-1. The jury's damages award, however, includes units for which VirnetX has already received a royalty, *i.e.*, devices that include downloads of licensed Skype units. 4/5/18 PM Tr. 160:5–7. Under the 2014 Microsoft Amendment, Skype is licensed on non-Microsoft platforms, such as Skype on iOS. *See, e.g.*, 4/5/18 PM Tr. 159:12–18; PX1084 at 2–3. Therefore, Apple devices that include Skype and other Microsoft features are ***already licensed*** to VirnetX's patents through the Microsoft Agreement. Because VirnetX may not obtain an additional royalty for already-licensed devices, *Aero Prods.*, 466 F.3d at 1017–20, Apple should be awarded an offset for those devices to avoid double recovery. *See Bowers v. Baystate Techs., Inc.*, 320 F.3d 1317, 1327–28 (Fed. Cir. 2003).

## F.     No Reasonable Jury Could Find Damages in Excess of $25.1 Million

The undisputed record establishes that no jury could award more than $25.1 million in damages. VirnetX's damages model relies on unapportioned royalty rates from non-comparable licenses and improperly diminishes the one comparable license in the record, the Microsoft Agreement. *See* § II.A, *supra*. In his Market Approach, which is based upon the VirnetX license agreements, Mr. Bakewell concluded that the Microsoft Agreement is the most comparable. Mr. Bakewell accounted for the worldwide scope of the Microsoft Agreement and explained how excluding foreign sales resulted in an artificially higher royalty rate. 4/9/18 PM Tr. 258:5–259:21; *Ericsson*, 773 F.3d at 1226–28. Including the correct number of licensed units, Mr. Bakewell concluded that the Microsoft Agreement's per-unit rate is no more than $0.06 (although additional apportionment would need to be done to account for the value contributed by patents other than the patents-in-suit). 4/9/18 PM Tr. 258:6-22. According to VirnetX's licensing policy in which one royalty is assessed regardless of the number of features found to infringe, the reasonable royalty should be no more than $0.06 if both VOD and FaceTime are found to infringe.

With respect to FaceTime alone, Mr. Bakewell used the Income Approach to determine the

26

contribution of the '504 and '211 patents to that feature. Starting with the $0.99 market price of the standalone FaceTime app and apportioning for the roughly 1% of consumers who were aware that FaceTime calls are always encrypted (and for whom the patented technology could have driven demand for the feature), Mr. Bakewell determined that the royalty should be $0.01. 4/9/18 PM Tr. 259:23–261:19.

Accordingly, the reasonable royalty supported by the record and reliable economic analysis cannot be in excess of $25.1 million if both VOD and FaceTime infringe, and cannot be in excess of $4.1 million if only FaceTime infringes. 4/9/18 PM Tr. 262:23–263:17. If only VOD infringes, damages cannot be more than $0.06 for each unit that contains redesigned VOD. *Id.* 263:22–264:1.

For all of these reasons, Apple's motion for JMOL on damages should be granted.

## III.   VirnetX Failed to Present Sufficient Evidence to Support a Finding of Willfulness

No reasonable jury could have found any infringement by Apple to be willful. *See* Fed. R. Civ. P. 50(a)–(b); *see also Am. Home Assur. Co. v. United Space Alliance, LLC*, 378 F.3d 482, 487 (5th Cir. 2004). VirnetX failed to prove that Apple subjectively knew or should have known that it was infringing any valid claim. To the contrary, it is undisputed that (1) Apple immediately took significant efforts to redesign FaceTime and VOD after the 417 Action verdict; (2) Apple reasonably relied on opinions of independent counsel concerning non-infringement of those redesigns; (3) Apple subjectively believed in its reasonable non-infringement defenses; and (4) Apple subjectively and in good faith believed that the asserted claims were invalid, a reasonable belief that was ultimately confirmed as correct by PTO proceedings that will cancel the asserted claims, pending only Federal Circuit affirmation.[2] Accordingly, Apple is entitled to JMOL of no

---

[2] Because evidence of the USPTO proceedings was excluded, *see* D.I. 646 at 172:20–173:2; 4/8/11 AM Tr. 8:1–23, 20:5–15, Apple submitted this evidence via an offer of proof, D.I. 717.

willful infringement. *See WesternGeco LLC v. ION Geophysical Corp.*, 837 F.3d 1358, 1363–64 (Fed. Cir. 2016), *cert. granted on other grounds*, 138 S. Ct. 734 (2018).

Additionally, VirnetX's failure to move for a preliminary injunction precludes basing a finding of willfulness solely on post-complaint activity. *See Dorman Prods., Inc. v. Paccar, Inc.*, 201 F. Supp. 3d 663, 681 (E.D. Pa. 2016), *as amended* (Oct. 17, 2016) ("Absent evidence of pre-filing willful infringement, a patentee who does not seek a preliminary injunction may not base a claim for willful infringement solely on the infringer's post-filing conduct.") (citation omitted); *Radware, Ltd. v. F5 Networks, Inc.*, No. 5:13-CV-02024-RMW, 2016 WL 4427490, at *6 (N.D. Cal. Aug. 22, 2016) ("[S]ince Radware did not seek a preliminary injunction, it is not entitled to a finding of willfulness based solely on F5's post-complaint infringement."). VirnetX filed this lawsuit on November 6, 2012, almost a year before Apple implemented the redesigns at issue in this case. (*See* D.I. 1.)  VirnetX did not seek a preliminary injunction, and thus cannot base its willful infringement claims on post-filing conduct.

## A.   Apple's Reasonable and Good Faith Redesigns Preclude Willfulness

Immediately following the verdict in the -417 Action, even though Apple intended to (and successfully did) appeal, *VirnetX*, 767 F.3d at 1314,[3] Apple diligently began redesigning FaceTime and VOD in a manner that it believed would no longer infringe. Apple did so in reliance on VirnetX's litigation positions and independent advice of counsel, and Apple implemented those redesigns less than a year after the verdict. *See, e.g.*, 4/3/18 AM Tr. 61:19–62:17, 77:19–78:2; 4/11/18 AM Tr. 30:13–18, 49:1–10, 53:3–54:13, 57:21–24, 58:22–59:4, 90:10–94:1, 95:12–96:14; 4/11/18 PM Tr. 6:14–8:21, 11:11–12:1, 13:9–15:21, 34:11–21, 42:25–43:4; DTX93 at 4–5; DTX94 at 4–5; DTX97 at 2–4; DTX98 at 2–4. Those good-faith redesign efforts, which Apple

---

[3] Evidence of Apple's -417 appeal was excluded. D.I. 644 at 1; D.I. 646 at 106:17–107:21.

undertook to *avoid* further infringement, preclude a finding of willfulness. *See Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1571 (Fed. Cir. 1996). ("Even if a party is subsequently found to be infringing another's patent despite its investigations, it will be liable only for compensatory damages, not increased damages, if it performed its affirmative duty in good faith."). Indeed, a party's *bona fide* attempts to design a non-infringing product—as Apple did here—should be encouraged, not punished with a willfulness finding. *Westvaco Corp. v. Int'l Paper Co.*, 991 F.2d 735, 745 (Fed. Cir. 1993) (explaining "design arounds" are "[o]ne of the benefits of a patent system" and "should not be discouraged by punitive damage awards except in cases where conduct is so obnoxious as clearly to call for them"); *Slimfold Mfg. Co. v. Kinkead Indus., Inc.*, 932 F.2d 1453, 1457 (Fed. Cir. 1991) (explaining that "[d]esigning around patents . . . works to the advantage of the public in promoting progress in the useful arts, its constitutional purpose"); *see also Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1935 (2016) ("[P]atent law reflects 'a careful balance between the need to promote innovation' . . . and the importance of facilitating the 'imitation and refinement through imitation' that are 'necessary to invention itself[.'"]) (citation omitted).

Apple redesigned VOD and FaceTime through a collaboration among its engineers, management, and legal team. 4/6/18 AM Tr. 68:24–69:19; 4/6/18 PM Tr. 161:8–162:5; 4/11/18 AM Tr. 90:10–96:14; 4/11/18 PM Tr. 6:14–8:21, 13:9–15:21. With respect to VOD, Apple's engineers and managers, in consultation with Apple's legal department, identified the VOD configurations impacted by the -417 Action verdict and developed solutions that they believed in good faith would avoid infringement. *See, e.g.*, 4/3/18 AM Tr. 61:19–62:17, 77:19–78:2; 4/3/18 PM Tr. 162:6–12, 165:15–19, 173:9–12; 4/4/18 AM Tr. 75:18–22; 4/6/18 AM Tr. 68:24–69:19; 4/6/18 PM Tr. 161:5–162:18; 4/11/18 PM Tr. 6:24–8:21, 13:14–15:21. Likewise, for FaceTime, Apple's engineers believed in good faith that they had developed a way to initiate peer-to-peer

calls different from VirnetX's patents. Indeed, the PTO granted a patent for Apple's solution over VirnetX's patents-in-suit, demonstrating the reasonableness of Apple's good-faith belief of non-infringement. 4/9/18 PM Tr. 254:23–257:1; 4/11/18 AM Tr. 98:22–99:7; *see also* DTX201.

**B.      No Evidence of Copying Exists, Weighing against Willfulness**

Copying is relevant to willfulness. *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 827 (Fed. Cir. 1992); *Anascape, Ltd. v. Microsoft Corp.*, No. 9:06-CV-158, 2008 WL 7182476, at *4 (E.D. Tex. Apr. 25, 2008). Here, VirnetX introduced no evidence of copying, and none exists. VirnetX's own expert conceded the lack of any evidence of copying, and Apple's witnesses likewise confirmed that they could not have copied any VirnetX product because they were not aware of any VirnetX product when creating the redesigns. 4/11/18 AM Tr. 64:12–21, 96:12–14, 99:14–19; 4/11/18 PM Tr. 12:23–13:8, 122:6–7. The lack of copying in this case further shows Apple's good faith and militates against a finding of willful infringement. *Read*, 970 F.2d at 827.

**C.      Apple's Reasonable Reliance on Counsel's Advice Precludes Willfulness**

Apple did not rely exclusively on its own assessment or VirnetX's statements in determining that its redesigns would not infringe. Rather, prior to implementing its redesigns, Apple also sought independent opinion counsel—Mr. Lee Van Pelt—to assess its redesigns for VOD and FaceTime. *See, e.g.*, 4/11/18 AM Tr. 55:4–6, 90:10–91:16, 99:20–100:4; 4/11/18 PM Tr. 13:9–15:21, 34:11–21, 42:25–43:4; DTX93; DTX94; DTX97; DTX98. "On-going consultation with a patent lawyer is highly probative evidence of good faith." *Braun Inc. v. Dynamics Corp. of Am.*, 975 F.2d 815, 822–24 (Fed. Cir. 1992) (reversing a jury verdict of willfulness where accused infringer had consulted opinion counsel during all stages of the design-around effort). Indeed, favorable opinions of counsel, such as those received by Apple, normally present a well-grounded defense to willfulness unless they are ignored or found incompetent. *See Read*, 970 F.2d at 828–29.  Neither of those limited exceptions applies here.

30

Rather, Apple affirmatively relied on Mr. Van Pelt's conclusions. Apple retained Mr. Van Pelt in order to provide an independent analysis as to whether its redesigns would infringe VirnetX's patents. 4/11/18 AM Tr. 51:13–20, 51:24–52:4, 99:24–100:4; 4/11/18 PM Tr. 13:14–14:9, 40:17–41:15, 60:24–61:1. Mr. Van Pelt opined that Apple's redesigns did not infringe—in part based on the -417 Action, during which VirnetX's own expert opined on noninfringing alternative designs, *see*, *e.g.*, 4/11/18 AM Tr. 53:3–54:13; DTX93 at 4–5; DTX94 at 4–5; DTX97 at 2–4; DTX98 at 2–4—and Mr. Van Pelt presented his opinions to Apple's in-house legal department as well as senior engineers responsible for implementing further changes to the accused features. *See*, *e.g.*, 4/11/18 AM Tr. 55:4–6, 90:10–91:16, 99:20–100:4; 4/11/18 PM Tr. 13:9–15:21, 34:11–21, 42:25–43:4. Mr. Van Pelt advised Apple that redesigned VOD and redesigned FaceTime would not infringe VirnetX's patents, and Apple reasonably relied on that advice before releasing those features in iOS 7. *See*, *e.g.*, 4/11/18 AM Tr. 55:4–6, 90:10–91:16, 99:20–100:4; 4/11/18 PM Tr. 13:9–15:21, 18:22–19:11, 21:11–22, 23:6–9, 34:11–21, 42:25–43:4, 46:3–16. After Mr. Van Pelt provided Apple with his conclusions, he prepared detailed written opinions, met with Apple's executives to explain his opinions, and confirmed Apple's reliance on his advice. *See*, *e.g.*, 4/11/18 AM Tr. 99:20–108:15; 4/11/18 PM Tr. 16:2–23:9, 42:25–43:20, 44:14–60:17, DTX93; DTX94; DTX97; DTX98. Moreover, Apple presented testimony at trial from its executives explaining that they relied on Mr. Van Pelt's conclusion of non-infringement before authorizing the public release of the redesigns. 4/11/18 AM Tr. 93:19–94:1, 96:2–6, 101:5–8, 103:22–104:4, 107:7–15, 107:22–108:15; 4/11/18 PM Tr. 13:14–15:21, 22:23–23:9. This alone warrants JMOL. *See Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1339 (Fed. Cir. 2008) ("a competent opinion of counsel concluding [] that [the accused infringer] did not infringe the [] patent . . . would provide a sufficient basis"); *Halo*, 136 S. Ct. at 1937 ("consulting counsel may

help draw the line between infringing and noninfringing uses.").

Additionally, no dispute exists that Mr. Van Pelt's opinions were thorough and reliable. As he testified at trial, Mr. Van Pelt reviewed the asserted patents, their file histories, prior art cited during prosecution, prior litigation and testimony, the Court's claim construction decisions, and technical documentation, and met with Apple's engineers to understand the design and operation of the accused features. *See, e.g.*, 4/6/18 AM Tr. 68:24–69:19; 4/11/18 PM Tr. 41:16–42:24, 45:15–20, 47:13–49:24, 51:6–10, 52:4–9, 53:4–12, 54:4–57:4, 58:7–60:2; DTX93; DTX94; DTX97; DTX98. Mr. Van Pelt concluded that the redesigns did not infringe any claim of the patents-in-suit after speaking with engineers and reviewing documents for about two months. 4/11/18 PM Tr. 34:11–21. Mr. Van Pelt memorialized those conclusions in writing, in March 2014, after working on the project for about six months. 4/11/18 AM Tr. 37:9–11, 100:8–24; 4/11/18 PM Tr. 16:2–14, 44:10–20, 45:10–11; *see also* DTX93; DTX94; DTX97; DTX98. In his written opinions, Mr. Van Pelt set forth the applicable law, analyzed the patents' prosecution history, analyzed the claims and the Court's claim constructions, summarized his understanding of the accused features and redesigns, analyzed literal infringement and the doctrine of equivalents, and explained how he arrived at his conclusions. *See* DTX93; DTX94; DTX97; DTX98. Those opinions preclude a finding of willfulness. *See Westvaco Corp. v. Int'l Paper Co.*, 991 F.2d 735, 743–44 (Fed. Cir. 1993).

Finally, Apple's reliance on Mr. Van Pelt's opinions was eminently reasonable. Mr. Van Pelt was, and is, an independent attorney. 4/11/18 PM Tr. 33:4–8; s*ee W. Elec. Co. v. Stewart-Warner Corp.*, 631 F.2d 333, 337 (4th Cir. 1980) ("Stewart-Warner might be on firmer ground in this case had it sought the opinion of an outside attorney."). As explained above, Mr. Van Pelt performed a thorough analysis, including by meeting with Apple's engineers to gain an

32

understanding of the operation of the redesigns, reviewing Apple's technical documentation and source code, and providing his detailed conclusions to Apple's legal team and executives. 4/11/18 AM Tr. 56:1–8, 59:24–61:13, 99:24–108:6; 4/11/18 PM Tr. 16:2–17:17, 17:24–19:11, 20:15–22:3, 22:7–22, 41:16–42:24, 43:12–20, 45:4–20, 52:21–23, 53:13–55:5, 60:3–17. Apple's reliance on those opinions was reasonable, precluding a finding of willfulness despite the jury's verdict of infringement. *See Ortho Pharm. Corp. v. Smith*, 959 F.2d 936, 944–45 (Fed. Cir. 1992).

### D.    Apple's Successful -417 Action Appeal Precludes Willfulness

Apple's ***successful*** appeal of the infringement verdict regarding FaceTime from the 2012 -417 Action trial also demonstrates the reasonableness of Apple's conduct. Apple's FaceTime redesign, which maintained the absence of anonymity, was reasonable in light of the Federal Circuit's rejection of VirnetX's arguments and adoption of Apple's claim-construction position regarding "anonymity." Indeed, the Federal Circuit agreed with Apple that the prior construction of "secure communication link" was incorrect, and remanded the case for further proceedings. *VirnetX*, 767 F.3d at 1317-19. The Federal Circuit also reversed the prior finding of infringement by VOD under the doctrine of equivalents as to one claim. *Id.* at 1323.

### E.    Apple's Reasonable Defenses Preclude Willfulness

Apple also presented multiple reasonable defenses on appeal and at trial that foreclose willfulness in this case. *See supra* § I. For example, Apple put forth the reasonable claim-construction defense that redesigned FaceTime lacked the "domain name service system" claimed in the '504 and '211 patents, because the new system no longer sent a recipient's IP address to the sending device and thus the servers did not operate as a "domain name service." Though the Court ultimately held that "domain name service system" does not incorporate the construction of "domain name service," 1/19/16 Tr. 65:1–3, Apple's claim-construction position was reasonable. A noninfringement defense based on a reasonable claim construction position precludes a finding

of willfulness. *Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1374 (Fed. Cir. 2008).

### F.    Apple's Belief That the Asserted Claims Were Invalid Precludes Willfulness

Apple has also maintained a good-faith belief that all asserted claims of all four patents-in-suit are invalid, a belief that the PTO has repeatedly confirmed. In July 2011, over a year before the -417 Action trial in 2012, Apple informed VirnetX that it had concluded that all asserted claims were invalid. Apple (and others) soon petitioned the PTO to cancel all asserted claims. D.I. 717. By March 2012, the PTO had granted the reexamination requests because the petitions presented a "substantial new question of patentability" or a "reasonable likelihood" of establishing that the claims were unpatentable. *Id.* And by the time of the first trial, the PTO had rejected every asserted claim as unpatentable on multiple grounds. *Id.* While redesigning the accused products, Apple continued to challenge the validity of VirnetX's patents through the PTO. *See* D.I. 717. Ultimately, the PTO agreed with Apple regarding the invalidity of VirnetX's patents and issued final rejections for every asserted claim of the '504, '211, '135, and '151 patents as unpatentable—decisions which will result in the cancellation of the asserted claims upon Federal Circuit affirmance.[4] *See id*.

Those PTO post-grant proceedings uniformly establish that the asserted claims are unpatentable and, thus, are incapable of being infringed. Not only did Apple hold a consistent, reasonable belief in the invalidity of VirnetX's patents long before the trial began, but the PTO has confirmed that Apple was right. *See*, *e.g.*, *Safoco, Inc. v. Cameron Int'l Corp.*, No. H-05-0739, 2009 WL 2424108, at *21 (S.D. Tex. July 31, 2009) (PTO reexamination "militates against [a] claim for willful infringement"); *Fujitsu Ltd. v. Belkin Int'l, Inc.*, No. 10-CV-03972-LHK, 2012 WL 4497966, at *35 (N.D. Cal. Sept. 28, 2012) (institution of reexamination is relevant to

---

[4] U.S. Patent Nos. 8,051,181 and 8,504,697 were also asserted in this action and have now been found finally invalid. These related patents share a nearly identical specification to the patents-in-suit, and have claims with inconsequential differences.

willfulness analysis).

## IV.  Apple Is Entitled to a New Trial on All Issues

### A.  The Court Erred in Giving VirnetX's Proposed "Domain Name Service System" Instruction

The Court's decision to give VirnetX's proposed instruction regarding "domain name service system" over Apple's objection resulted in prejudicial error. Although the Court determined that the term "domain name service system" did not include the construction for "domain name service," that fact was entirely irrelevant to the issues the jury had to decide and only served to prejudice Apple and confuse the jury. During cross-examination of Apple's expert Dr. Blaze, counsel for VirnetX complained that Apple was improperly seeking to argue non-infringement under the construction of "domain name service system" that the Court rejected. 4/9/18 AM Tr. 109:19–110:5. But Dr. Blaze *never* made this argument. In fact, Dr. Blaze *agreed* that the Court did not incorporate the "domain name service" construction into the term "domain name service system." *Id.* at 113:23–114:1. VirnetX's proposed instruction was thus irrelevant and unnecessary. VirnetX's instruction also significantly prejudiced Apple. The key issue at trial was whether the "accept push" message could indicate support for a "direct" communication link where it omitted the IP address of the callee necessary to establish such a link. It was undisputed that a caller is unable to initiate a direct FaceTime call to the callee based on the contents of the accept push message alone because of the removal of the IP address. 4/10/18 Tr. 79:24–80:2. VirnetX's irrelevant instruction, however, inappropriately suggested to the jury that the failure to return an IP address could not be a basis for non-infringement. A new trial is warranted.

### B.  The Jury's Infringement Verdict Is against the Weight of the Evidence

The weight of the evidence demonstrates that Apple does not infringe directly or indirectly. Where, as here, the issues tried are "so interwoven . . . that [one] cannot be submitted to the jury

35

independently of the [others] without confusion and uncertainty," the grant of a new trial on any

liability issue should result in a new trial on damages; to do otherwise "would amount to a denial

of a fair trial." *See Gasoline Prods. Co. v. Champlin Ref. Co.*, 283 U.S. 494, 500–01 (1931);

*Yarbrough v. Sturm, Ruger & Co.*, 964 F.2d 376, 380 (5th Cir. 1992) (affirming grant of new trial

on all issues where "liability finding . . . apparently was deliberately made to reach a certain amount

of damages"). At minimum, if the Court disturbs a finding of direct infringement, a new trial

should be granted on indirect infringement, and vice versa. *See Lyle v. Bentley*, 406 F.2d 325, 327–

28 (5th Cir. 1969) ("[I]f th[e] deliberations . . . permit a verdict to b[e] based on an issue not

supported by sufficient evidence, the jury verdict must be set aside and a new trial held.").

## 1.     The Accused Features Do Not Infringe

The weight of the evidence does not support infringement by the accused features. Ignoring

this, VirnetX focused its case on irrelevant and incorrect facts to ask the jury to decide the case on

improper grounds. With FaceTime, VirnetX spent nearly its entire case on whether Apple made

changes to FaceTime after April 2013 to reduce relay usage. *See, e.g.*, 4/5/18 PM Tr. 233:13–

259:8. But these changes were irrelevant to VirnetX's infringement theory, which concerned

whether the "accept push" message sent by the FaceTime server provided the claimed "indication"

that "the domain name service system supports establishing a secure communication link." Instead,

VirnetX used these changes to argue to the jury that Apple somehow acted improperly and

therefore infringed. *See, e.g.*, 4/10/18 Tr. 148:8–149:9. Notwithstanding VirnetX's smoke-and-

mirrors attempt to confuse the jury, the evidence demonstrated that FaceTime does not include the

claimed "indication." *Supra* § I.A.1. Regarding "domain name service system," as noted above,

the jury was instructed that "domain name service system" should be construed as having its plain

and ordinary meaning and that "the construction for 'domain name service system' . . . does not

incorporate or include the Court's construction for the term 'domain name service.'" 4/10/18 Tr.

128:10–15. This construction is incorrect because it eliminates "domain name service" from "domain name service system," robbing the term "domain name service system" of any meaning. D.I. 373. Redesigned FaceTime does not infringe under the correct construction of "domain name service system," because it is undisputed that the alleged domain name service system in redesigned FaceTime was changed "to zero out or effectively remove the callee IP address." 4/3/18 PM Tr. 167:9–11; *see also id.* at 169:6–8 ("Q. Okay. And after the change in September, still the accept push message did not have the IP address of the callee? A. Correct.").

The weight of the evidence similarly does not support infringement of VOD. At trial, VirnetX repeatedly argued that Apple "moved" the infringing Always mode from the prior version to the redesigned version. *See, e.g.*, 4/2/18 PM Tr. 190:18–191:3; 4/3/18 AM Tr. 78:3–6; 4/3/18 PM Tr. 132:20–133:1, 134:1–14; 4/10/18 Tr. 147:15–21, 152:19–153:1. Not only was such an analysis improper, because it improperly compared the accused products with the old products rather than the claims, *see Zenith Labs., Inc. v. Bristol-Meyers Squibb Co.*, 19 F.3d 1418, 1423 (Fed. Cir. 1994), it was also undisputedly incorrect. Indeed, VirnetX's expert ***admitted*** that substantial differences exist between the old Always mode and the current accused products. 4/3/18 PM Tr. 193:18–194:1, 195:10–196:3. VirnetX's argument thus improperly asked the jury to decide the case on incorrect grounds. Because the weight of the evidence demonstrates that redesigned VOD does not infringe either the '135 or '151 patent, as explained *supra* § I.B, a new trial is warranted. Moreover, claims 1 and 7 of the '135 patent are method claims, and the remaining claims asserted against VOD are directed to computer instructions that perform specific steps. The record, however, is bereft of evidence that anyone ever used VOD in the only (and optional) configuration that VirnetX accuses of infringement. *See supra* § I.B. Indeed, the numerous configurations of VOD that VirnetX did not accuse confirm that VOD does not "necessarily" infringe. *See Exergen*

37

*Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1322 (Fed. Cir. 2009).

### 2.   Apple Does Not Indirectly Infringe

The weight of the evidence confirms that Apple did not "knowingly induce[] infringement and possess[] specific intent to encourage another's infringement." *ACCO*, 501 F.3d at 1312. No evidence exists that anyone used redesigned VOD in an infringing way, which precludes Apple from being liable as an indirect infringer, and Dr. Jones's conclusory testimony is not evidence of inducement. *Supra* § I.D; *see PharmaStem Therapeutics, Inc. v. Viacell, Inc.*, 491 F.3d 1342, 1355 (Fed. Cir. 2007). Moreover, the weight of the evidence demonstrates Apple's firm and reasonable belief that it did not infringe. *See supra* § I.D. Indeed, Apple took affirmative steps to try to avoid infringement, including redesigning the accused features. *See id.*

## V.   Apple Is Entitled to a New Trial on Damages

Should the Court set aside the jury's infringement verdict as to either VOD or FaceTime, a new trial on damages should be granted because the damages verdict for one feature is not separable from the damages verdict for the other. *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1309–10 (Fed. Cir. 2007); *see also Gasoline Prods.*, 283 U.S. at 500–01.

Separately, the Court should grant Apple a new trial on damages for the following four reasons, which are discussed in more detail below. *First*, Mr. Weinstein's unreliable testimony, on which the jury based its award of over $502 million, should have been excluded under *Daubert*. *Second*, the exclusion of the PTO's final written decisions gave the jury the false impression that VirnetX's claimed invention provided an improvement over the prior art. *Third*, the jury instructions improperly omitted instructions on the EMVR and incorrectly framed the hypothetical negotiation, which left the jury without the proper guidance to award damages. *Finally*, where, as here, a "court is left with the perception that the verdict is clearly excessive, deference [to the verdict] must be abandoned" and a new trial granted. *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 488

(5th Cir. 2001) (citation omitted); *Perricone v. Kansas City S. Ry. Co.*, 630 F.2d 317, 319–20 (5th Cir. 1980); *see also Smartflash LLC v. Apple Inc.*, No. 6:13-cv-447-JRG, 2015 WL 5840237, at *8 (E.D. Tex. 2015) (Gilstrap, J.) (granting defendants' new trial motion). For each of these reasons, the Court should grant Apple's motion for a new trial.

### A.      Mr. Weinstein's  Testimony Should Have Been Excluded

Mr. Weinstein's testimony should have been excluded under *Daubert*. D.I. 217, 243, 323, 354, 546; 4/5/18 AM Tr. 21:15–22:4. His unreliable testimony was directly responsible for the jury's excessive $502 million damages award, which was based on unapportioned licenses with EMVR-based royalty rates that compensated VirnetX beyond the footprint of its inventions. *See supra* §§ II.A–D; *infra* § V.C.1. "Without the requisite apportionment, the jury lacked sufficient evidence on which to base its damages award, and, consequently, a new trial on the issue of damages is appropriate." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, No. C 09-5235 MMC, 2014 WL 6859521, at *2 (N.D. Cal. Nov. 25, 2014). Due to the improper admission of Mr. Weinstein's testimony, Apple's motion for a new trial should be granted.

### B.      The Exclusion of the PTO Proceedings Warrants a New Trial on Damages

The exclusion of the PTO's final written decisions holding every asserted claim "unpatentable" impermissibly allowed VirnetX to expand the footprint of its claimed invention. For example, Mr. Weinstein relied on *Georgia-Pacific* factors 9 and 10, which relate to the "utility and advantages of the patent property over the old modes or devices" and "[t]he nature of the patented invention[.]" *Ga.-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D. N.Y. 1970); 4/5/18 AM Tr. 62:19-63:13. Specifically, Mr. Weinstein testified about "the importance of secure -- secure communications that are easily -- easily obtained[]," opining that the operation of VOD and FaceTime was an advantage over prior methods. 4/5/18 AM Tr. 63:9–13. Moreover, in the first moments of trial, Dr. Short testified that he invented "a very easy way for the average

user, anyone in this courtroom using a computer on the internet to have safe, secure communications automatically." 4/2/18 PM Tr. 197:16–20. Dr. Short then purported to differentiate his invention from the prior art. *Id.* at 198:10–12, 210:7–211:24, 213:9–215:9.

Apple, however, was precluded from introducing evidence that the claimed invention has *no* utility and advantages over old modes or devices, nor was Apple allowed to introduce evidence about the limited nature of the patented invention, because Apple could not present the PTO's final written decisions declaring each claim "unpatentable" over the prior art. D.I. 606 at 5. The exclusion of this evidence was error and presented the jury with an inaccurate impression of the nature and value of the patents. *See Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 343 (1971) ("A patent yielding returns for a device that fails to meet the congressionally imposed criteria of patentability is anomalous."). Because of the exclusion of this critical evidence, a new trial on damages should be granted.

### C.     The Jury Instructions on Damages Were Erroneous

The Court declined to give Apple's proposed EMVR and hypothetical negotiation instructions. 4/9/18 PM Tr. 305:8–19, 315:17–320:8; 4/10/18 Tr. 18:22–19:4, 21:1–23:5. Apple's proposed instructions were correct and not "substantially covered in the charge." *See United States v. John*, 309 F.3d 298, 304 (5th Cir. 2002). The jury's excessive damages award confirms that the failure to give these instructions "seriously impaired" Apple's ability to defend itself, and a new trial should be granted. *See id.*

### 1.     The Jury Should Have Been Instructed on the EMVR

VirnetX did not meet the strict requirements of the EMVR. As explained in § II.D, *supra*, VirnetX relied upon per-unit rates that were merely conversions of percentage-based royalties that the Federal Circuit held violated the EMVR. *VirnetX*, 767 F.3d at 1329. VirnetX also used the EMV of Apple's products to suggest that its damages model was reasonable, introducing the

information necessary for the jury to calculate damages based on Apple's products' full value. § II.D, *supra*; *see also* 4/5/18 AM Tr. 41:11–23, 82:18–24, 4/10/18 Tr. 204:10–12. VirnetX, however, introduced no evidence that FaceTime or VOD were the "sole reason" consumers purchase Apple devices, much less that the patented technology in these features motivated consumers to purchase Apple devices. *LaserDynamics*, 694 F.3d at 68; 4/5/18 AM Sealed Tr. 77:2–6 (explaining ███████████████████████████ FaceTime feature, which is broader than the patented technology); 4/9/18 PM Tr. 168:22–169:1. And Mr. Weinstein testified that he did not apportion FaceTime and VOD beyond the value of the entire apps, despite the fact that both include more than just VirnetX's patented technology. 4/5/18 AM Tr. 101:7–105:6; *see also id.* 98:22–100:23. Because VirnetX used EMVR-based rates and encouraged the jury to apply a percentage-based royalty rate to the EMV of Apple's products, the jury should have been given an EMVR instruction. The jury was not so instructed, and its award of over $502 million using Mr. Weinstein's improper $1.20 royalty rate confirms that the award violated the EMVR or, at minimum, that EMV-based evidence served as an improper reasonableness check on the jury's award. *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1321 (Fed. Cir. 2011). Because the jury was not instructed on the EMVR, a new trial should be granted.

## 2.     The Hypothetical Negotiation Instruction Was Incorrect

Apple proposed that the jury be instructed that a reasonable royalty is "the reasonable amount someone wanting to use the patented invention would be willing to pay to the patent owner and the patent owner would be willing to receive." D.I. 621, Ex. B at 21–22 & n. 27. The jury, however, was instructed that a reasonable royalty is "the reasonable amount that someone wanting to use the patented invention should ***expect to pay*** to the patent owner and the patent owner should ***expect to receive***." 4/10/18 Tr. 18:22–19:4, 21:1–23:5. This is an incorrect statement of the law. The Federal Circuit has made clear that a "reasonable royalty is the amount that 'a person, desiring to

manufacture [, use, or] sell a patented article, as a business proposition, ***would be willing to pay*** as a royalty . . . .'" *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 770 (Fed. Cir. 2014) (quoting *Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1568 (Fed. Cir. 1984)); *see also Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1240 (Fed. Cir. 2011) (discussing evidence "regarding a reasonable royalty that Home Depot would have been ***willing to pay***").

VirnetX exploited this incorrect statement with testimony from its CEO Kendall Larsen. Mr. Larsen testified that VirnetrX "ha[s] published [its] policies over time, and [it] would look at bringing any new licensee underneath this new umbrella of [its policy]." 4/4/18 AM Tr. 133:16–25. VirnetX repeated this theme with Mr. Weinstein's testimony, 4/5/18 AM Tr. 40:22–41:6, and in closing, when it stated that Apple would "show[] up having been trespassing on this property for years[]" and say "we're an agreed infringer, but we want a better rate than anyone who showed up and took a license voluntarily. We want a better rate than anybody. Any why is that?  Well, because we're Apple." 4/10/18 Tr. 161:12–18. The jury followed VirnetX's invitation to punish Apple and awarded VirnetX its expected—and excessive—$502 million in damages based on a $1.20 per-unit royalty rate. As explained in §§ II.A–C, *supra*, this is not a "reasonable" royalty. Even if VirnetX "expected" such an excessive royalty, Apple would not have been willing to pay it—particularly when Microsoft, Apple's competitor, paid at most $0.10 per unit on licensed products similar to Apple's. 4/5/18 AM Tr. 106:18–107:20 (Mr. Weinstein testifying that Microsoft "took responsibility" for its use of VirnetX's patents by paying $0.19 per unit); 4/5/18 PM Tr. 164:5–25 (conceding the correct royalty rate taking into account Microsoft's licensed foreign units and the 2014 amendment is $0.06). Because of this improper instruction on the determination of the reasonable royalty, a new trial on damages should be granted.

### D.    The Damages Award Is Excessive and against the Weight of the Evidence

VirnetX encouraged the jury to punish Apple for its infringement of claims that have been

found to be unpatentable and to award excessive damages, including by suggesting that Apple should be punished for its prior infringement. For example, during closing arguments, VirnetX suggested that Apple should get a worse deal than every other licensee because it previously infringed. 4/10/18 Tr. 161:12–18. This encouraged the jury to punish Apple through an exorbitant damages award. *See Gilster v. Primebank*, 747 F.3d 1007, 1011 (8th Cir. 2014) (granting new trial where plaintiff "made a deliberate strategic choice to make emotionally-charged comments at the end of rebuttal closing argument, when they would have the greatest emotional impact on the jury, and when opposing counsel would have no opportunity to respond").

VirnetX's licenses confirm that the jury's award of $502 million in damages for a limited time period and limited units is excessive. Mr. Weinstein's (and the jury's) $1.20 per-unit royalty rate was based on revenues and units over the life of the patents (through 2022) from six licenses. The 2010 Microsoft Agreement was a $200 million lump-sum payment that covered 2 billion units, for $0.10 per unit through 2022. 4/5/18 AM Tr. 109:11–110:16. According to Mr. Weinstein, the VoIP Licenses would generate only $5.2 million in "comparable" revenue on only 14.1 million "comparable" units through 2022. PX1088.03. Thus, for the 2010 Microsoft Agreement and VoIP Licenses **combined**, the total "comparable" revenues are $205.2 million and the total "comparable" units are 2.01 billion through 2022. And yet, based on those licenses, the jury awarded over $502 million in damages against Apple for 418 million units from September 2013 to March 2018. In other words, the jury awarded VirnetX nearly 250% of the total royalties for only 20% of the total licensed units (and for only four patents and less than five years).

The jury's award of over $502 million based on a per-unit royalty rate of $1.20 is against the weight of relevant and reliable economic evidence. *See Perricone*, 630 F.2d at 319–20. As explained in § II.A *supra*, the VoIP per-unit royalty rates are not apportioned for products like

Apple's and, in any event, are not comparable to the hypothetical negotiation. It is also uncontestable that the Microsoft Agreement is the only license to products comparable to Apple's. Mr. Weinstein admitted that his $0.19 per-unit rate for the Microsoft Agreement was not apportioned for Microsoft's worldwide sales, which he also admitted were subject to the license. 4/5/18 AM Tr. 107:11–110:16. Mr. Weinstein admitted that taking those licensed worldwide sales into account reduces the per-unit rate to $0.10. *Id.* And taking into account the 2014 Amendment, the per-unit rate was $0.06 per-unit. 4/5/18 PM Tr. 164:5–25. This $0.06 per-unit rate—from the only comparable license in the record—is the only reliable rate in the record (although it requires further apportionment to account for the patents and patent applications Microsoft received beyond the four patents at issue in this case). *Id.* at 109:11–110:16. The lack of apportionment in the jury's $1.20 per-unit rate is further reflected by the jury's award of the same per-unit rate regardless of whether one feature or two features infringed.

A jury's reasonable royalty award "must be within the range encompassed by the record as a whole. Here, it was not within that range." *See Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 519 (Fed. Cir. 1995). The weight of the evidence confirms that the jury's award of over $502 million, based on Mr. Weinstein's unreliable testimony and $1.20 per-unit rate, is not tied to the footprint of the alleged invention. *See LaserDynamics*, 694 F.3d at 67; *supra* §§ II.A–C. Accordingly, a new trial on damages should be granted or, in the alternative, remittitur to no more than $25.1 million if both FaceTime and VPN on Demand infringe, $4.1 million if only FaceTime infringes, and $0.06/unit if only VPN on Demand infringes, which is "the highest amount of damages that the jury could properly have awarded based on the relevant evidence." *See Unisplay*, 69 F.3d at 519.

For these reasons, Apple should be granted a new trial on damages.

## VI.     Apple Is Entitled to a New Trial on Willfulness

The weight of the evidence demonstrates that Apple's infringement was not willful. *Supra*

§ III. Immediately following the verdict in the -417 Action, Apple diligently began redesigning

VOD and FaceTime based on VirnetX's representations in that case, and implemented those

redesigns less than a year after the verdict. *Supra* § III.A. Apple further sought independent legal

counsel to assess the redesigns and reasonably relied on counsel's conclusion that the redesigns do

not infringe. *Supra* § III.C. Moreover, Apple's noninfringement arguments and its evidence that

the PTO held all the asserted claims unpatentable demonstrate that Apple's infringement defenses

are, at minimum, reasonable. *Supra* §§ I, III; D.I. 717.

Several rulings prevented Apple from properly defending against VirnetX's willfulness

allegations. First, Apple was precluded from presenting evidence challenging the validity and

enforceability of VirnetX's patents at trial. D.I. 181, 362. Second, Apple was prevented from

offering evidence that VirnetX's patents have been held unpatentable at the PTO. D.I. 646 at

172:20–173:2; 4/11/18 AM Tr. 8:1–23, 20:5–15. Because the jury did not hear that Apple

reasonably believed the patents-in-suit are invalid, it was given the incorrect impression that Apple

lacked a basis for such a belief. It was "wrong to conceal this important information from the jury."

*See Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2012 WL 1189898, at *3 (N.D. Cal.

Jan. 4, 2012); *see also Davidson Oil Country Supply Co. v. Klockner, Inc.*, 917 F.2d 185, 187 (5th

Cir. 1990) ("[T]he exclusion of all of this evidence created an atmosphere so unreal and so

prejudicial that it requires, in our very essential broad discretion, that all issues . . . be remanded

for a full retrial."). Accordingly, Apple requests a new trial on willfulness.

## VII.    Conclusion

For the foregoing reasons, Apple's motion for judgment as a matter of law and for a new

trial should be granted.

Dated: May 31, 2018

Respectfully submitted,

*/s/Joseph A. Loy*

Gregory S. Arovas
greg.arovas@kirkland.com
Robert A. Appleby
robert.appleby@kirkland.com
Jeanne M. Heffernan
jeanne.heffernan@kirkland.com
Joseph A. Loy
joseph.loy@kirkland.com
Leslie M. Schmidt
leslie.schmidt@kirkland.com
David N. Draper
david.draper@kirkland.com
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

F. Christopher Mizzo
chris.mizzo@kirkland.com
**KIRKLAND & ELLIS LLP**
665 Fifteenth Street, N.W.
Washington, D.C. 20005

Akshay S. Deoras
akshay.deoas@kirkland.com
**KIRKLAND & ELLIS LP**
555 California Street
San Francisco, California 94104

John M. Desmarais
jdesmarais@desmaraisllp.com
Michael P. Stadnick
mstadnick@desmaraisllp.com
Ameet A. Modi
amodi@desmaraisllp.com
**DESMARAIS LLP**
230 Park Avenue
New York, NY 10169
Telephone: (212) 351-3400
Facsimile: (212) 351-3401

Michael E. Jones
Texas Bar No. 10969400
mikejones@potterminton.com
**POTTER MINTON**
A Professional Corporation

46

110 N. College Avenue, Suite 500
Tyler, Texas 75702
Telephone: (903) 597-8311
Facsimile: (903) 593-0846

**ATTORNEYS FOR APPLE INC.**

## <u>CERTIFICATE OF SERVICE</u>

I certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via electronic mail on May 31, 2018.  I also hereby certify that all counsel of record who have consented to electronic service are being service with a notice of this document, under seal, pursuant to Local Rule CV-5(a)(7) on May 31, 2018.

*/s/Joseph A. Loy*

## <u>CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL</u>

I certify that the foregoing document is authorized to be filed under seal pursuant to the Protective Order entered in this case.

*/s/Joseph A. Loy*